## Commonwealth v. Anthony

*James P. MacElree III, district attorney,* and *Stuart Suss, assistant district attorney,* for the commonwealth.

*William H. Lamb* and *Suzanne M. O'Brien,* for defendant.

GAWTHROP, *J.,* October 8, 1987—We have convened at the request of the commonwealth to seek clarification of this defendant's sentence, and to see that the sentence as pronounced on February 24, 1987, is properly and lawfully carried out.[1] On that date, defendant entered a plea pursuant to a negotiated agreement with the commonwealth to be sentenced on count 2, the charge of Homicide by Vehicle, 75 Pa.C.S. §3732, a nonmandatory provision of the Motor Vehicle Code, to pay a fine of $450 together with costs of prosecution and also to serve a sentence of "Imprisonment: 13 months and 2 days

---

1. We have not convened to modify this defendant's sentence; on the contrary, we have convened to the end that the sentence not be modified. Thus, our denial of defendant's motion to quash on the basis of this court's loss of jurisdiction to modify sentence after the passage of 30 days. Pa.R.Crim.P. 1410.

— 32 months." In addition, defendant was sentenced on the same information, count 1, Driving Under the Influence, 75 Pa.C.S. §3731, to a concurrent term of imprisonment for a period of not fewer than 48 hours nor more than 23 months, plus paying a fine of $300, together with costs. Upon being paroled, defendant was to partake of evaluation by the Council on Addictive Diseases, as well as the Safe Driving School course.

After the plea was entered, and accepted by the court, defendant went to speak with the Office of Chester County Probation and Parole and was advised that she was eligible for work release and should apply therefor. Upon entering the Chester County Prison to begin serving her sentence on March 2, 1987, defendant did fill out such a formal work release request.

On July 1, 1987, defendant was approved by the Chester County Prison officials, and upon the decision of the warden, not then revealed either to the commonwealth or the court, defendant was released from prison and placed into this county's Electronic Home Confinement Program, permitted to reside in her home, and to work during the day and into the early evening in her place of employment in Villanova.

On August 13, 1987, correspondence began from the district attorney's office to counsel for defendant, expressing disagreement as to whether the Electronic Home Monitoring Program in which the warden had taken upon himself to place her, constituted a proper service of sentence in compliance with the governing law. Thereafter, the formal petition requesting clarification of status of sentence was filed, joining the issue now before us.

On Friday, September 11, 1987, the court heard testimony describing with some fullness the condi-

tions and the size of the population of the Chester County Prison, the conditions and availabilty of the work release program, in particular for women, in Chester County, as well as the manner of operation of the Electronic Home Monitoring Program. It was contended by the prison officials that the prison is full,[2] and there is an overcrowding problem, which is solved somewhat by the use of electronic home monitoring. They stated that there is grave difficulty in operating work release out of the Chester County Prison, in view of the necessity for strict security in that institution, requiring full body searches, for example, every time defendant returns from a day's work.[3] It was also mentioned that the work release facility in West Chester is operated in a different manner, more like a dormitory, with cyclone fencing and thick screening to prohibit one's walking off the premises, but devoid of actual jail cells and the other logistical paraphernalia of a traditional jail. In Chester County, that work release facility is available only to males. There is no equivalent female facility.

As for electronic home monitoring, it is carried out by the strapping of an electronic device to either a defendant's lower leg or to the inner aspect of a defendant's forearm, as was done in this case. Should defendant go farther than one hundred feet from her home telephone, to which there is affixed

2. The deputy warden testified that one of the reasons the prison is full is that the Chester County Prison has accepted into its population various inmates from other counties, as well as some federal prisoners, convicted in federal courts situate in this commonwealth and elsewhere.

3. The following week, at our second convening in this matter, counsel apprised the court that Delaware County in fact operates its work release facility directly out of its prison, with equal availability of the program to both genders.

an electronic monitoring device, an alarm is supposed to sound at the headquarters of the private corporation which offers this service to Chester County. Defendant is free to go to her own place of work during the day and evening, however; she calls the facility to advise them of her comings and goings from the vicinity of her home phone. The program costs defendant $12 per day.

## THE LEGAL STATUS OF ELECTRONIC HOME MONITORING

The threshold question must be addressed: what is the precise legal status of one who is placed on electronic home monitoring? The statutes make no specific provision therefor, although the sentencing code speaks to a rather full panoply of alternative gradations of physical restriction: (1) an order of probation, (2) a determination of guilt, (3) partial confinement, (4) total confinement, (5) a fine. 42 Pa.C.S. §9721(a). Counsel for defense argues that this electronic home monitoring constitutes partial confinement, the legislative nomenclature for what is often referred to as work release. Review of the definitional provision of partial confinement, however, constrains us to conclude otherwise. It states as a general rule: "In imposing a sentence involving partial confinement, the court shall specify at the time of sentencing the length of the term during which defendant is to be partially confined, which term may not exceed the maximum term for which he could be totally confined, and whether the confinement shall commence in a correctional or other appropriate *institution*." The statute goes on to note that the "court may in its order grant defendant the privilege of leaving the *institution* during necessary and reasonable hours for any of the following pur-

poses: (1) To work at his employment . . . ." 42 Pa.C.S. §9755 (a), (c) (emphasis supplied).

In construing the language of this provision, and in particular, construing the word "institution," which is not a term of art and which is undefined by the Legislature, we are mindful that we must construe that language according to common and approved usage. *Commonwealth v. Hill,* 481 Pa. 37, 391 A.2d 1303, 1306 (1978). The defense argues that the nocturnal restriction of this defendant to the vicinity of her home telephone is sufficient to fall within this statutory language. We disagree.

Webster's 3rd New International Dictionary, Unabridged, pertinently defines "institution" as a building or buildings occupied or used by an establishment of public character. A familiar example in this context is the term "State Correctional Institution." So also, doubtless would the Chester County Prison and the Chester County Work Release center qualify as "institutions." But to proclaim that this defendant's condominium in Devon is an institution, would be to stretch the language of the statute beyond its breaking point. That we may not do. When the words of the statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. §1921(b); *Commonwealth v. Duncan,* 271 Pa. Super. 395, 421 A.2d 257 (1980). Statutory penal provisions must be construed strictly. 1 Pa.C.S. §1928(b)(1). To construe this statute as urged by defendant would result in a construction that is not strict, but loose. Our quest is for linguistic definition, not euphemism.

This interpretation of the sentencing code is further reinforced by the work release statute itself, the Act of August 13, 1963, P.L. 774 §1, as amended November 26, 1968, P.L. 1103, §1; December 10,

1974, P.L. 824, §1 61 P.S. §2141.
"Absence From Jail for Occupational and Other Purposes

"Court order; purposes

"Whenever any person has been sentenced to undergo imprisonment in a county jail or workhouse, hereafter referred to as a jail, for a term of less than five years *the court* at the time of sentence or at any time thereafter upon applcation made therefor, *may by order direct* the sheriff, prison keeper, jail keeper, *warden* or other administrative head of a jail *to permit the prisoner to leave the jail during necessary and reasonable hours for the purpose of working at his employment,* conducting his own business or other self-employed occupation, including in the case of a woman housekeeping and attending to the needs of her family, seeking employment, attendance at an educational institution, securing medical treatment or such other lawful purposes as the court shall consider necessary and appropriate. The order of court may be rescinded or modified at any time with or without notice to the prisoner." (emphasis added).

Webster's, supra, defines "jail" inter alia as "prison, a building for the confinement of persons in lawful custody.". The Oxford American Dictionary defines "jail" as "a public prison." That jail means prison means jail would seem clear beyond cavil.

In so stating, and noting the Webster's language "in lawful custody," we are, nevertheless mindful of the line of cases interpreting "custody" as encompassing sufficient coercive features, in an isolated facility which its participants are forbidden to leave, with a regular head count, requiring one to be at a precise place at a precise time. *Commonwealth v. Mallon,* 267 Pa. Super. 163, 406 A.2d 569 (1979) That case, a 2-1 panel decision authored by Judge

Spaeth and concurred in by Judge Watkins, held that time spent in the Abraxas program counts for custody and inclusion in the computation of sentence served, to which defendant is entitled to credit under the Sentencing Code, 42 Pa.C.S. §9760 ("Credit . . . shall be given to defendant for all time spent in custody as a result of the criminal charge for which a prison sentence is imposed. . . .). *Mallon* relied upon a 2-1 panel per curiam opinion in *Commonwealth v. Usher,* 264 Pa. Super. 435, 399 A.2d 1129 (1979), which also involved the Abraxas program and held that the various rules and regulations of that program constituted sufficient restraint to qualify defendant for credit for the time he spent there. In so holding, the court relied upon *Commonwealth v. Jones,* 211 Pa. Super. 366, 236 A.2d 834 (1967), an en banc decision authored by Judge Watkins. The issue in *Jones* was whether defendant, who had been an inmate of Embreeville State Hospital, then an inpatient mental institution, was "in custody," under what is now section 9760 of the Sentencing Code, supra. The court relied upon two cases, *Commonwealth v. Wright,* 97 Pittsburgh L.J. 301 (1948), and *Commonwealth ex rel. Spanos v. Keenan,* 176 Pa. Super. 245, 107 A.2d 593 (1974). *Wright* considered whether credit should be given for time spent incarcerated in Farview State Hospital for the Criminally Insane, and in Montefiore Hospital, where defendant was sent and kept, not at liberty, for surgical care which could not properly be given at the Allegheny County jail. The court there held that hospitalization time spent while under sentence counted for sentencing purposes, applying a specific statute which so provided. *Commonwealth ex rel. Spanos v. Keenan,* supra, approved the granting of credit for time in which one is held in custody, including that time while Mr. Spanos

was in restraint while at the Pennsylvania Institution for Mental Defectives at Huntington.

The *Jones* court, in holding that the time spent in Embreeville State Hospital counted as time running on the sentence, went on to state broadly: "Custody, in criminal law, is the same thing as detention in civil law, and is synonymous with imprisonment. Imprisonment is the detention of a person against his will." 211 Pa. Super. at 370. It was that language which the *Usher* and *Mallon* panels, comprising a total of three judges in the majorities, two in the dissents,[4] used as a springboard to hold that the Abraxas program constituted custody for the purpose of computing credit for time served. We well recognize that that broad language, taken out of factual and legal context, could be used as yet another springboard to apply to the situation at bar.

But that language, and its line of caselaw, is clearly distinguishable on two bases, one factual and one procedural. The facts of the custodial situations in those cases, be they in Farview, or Huntingdon, or Embreeville, or Abraxas, or under the surgeon's knife at Montefiore, entail custodial contexts far more restricted than the living-in-one's-home, going-to-one's-own-job context at bar. The mere presence of the monitor strapped on the forearm, compared to the joys of dwelling in some Farview dungeon, for example, presents something of a stark contrast. It is noteworthy that each of these

---

4. In particular, we note the dissent of Judge Price in *Mallon,* calling that case "clearly distinguishable from *Commonwealth v. Jones. . . .*" As for *Commonwealth v. Usher,* he said: "I cannot accept that decision, so must take this means of expressing strong disagreement. This, I fear, is but a forerunner of the future under the convoluted system of panels in this court." *Mallon,* supra, 406 A.2d at 572.

"custody" cases involved restriction of freedom in an actual institution.

Procedurally, also, the two contexts are significantly different. At bar, the narrow question we are now addressing is whether the terms "institution" and "jail" as used in the context of the partial confinement and work release statute include a defendant's electronically monitored home. In the cited line of cases, however, the narrow question which was being addressed was whether the time served in the various institutions was spent in sufficiently confined quarters so as to be worthy of credit for time served in custody, as that term of art has come to be defined in this specific statutory context. Here, we have expressly stated from the bench that, should we have jurisdiction, we are not precluding the possibility of giving this defendant credit for time served, albeit on electric home monitoring, on her non-mandatory term of imprisonment. We have made clear that, if we have the legal authority, we in no way wish to single her out for harsher treatment than those similarly situated, simply because of the chronological coincidence of her sentence allegedly being served during the very time the Chester County Common Pleas Court has promulgated a new administrative regulation, AR NO. 179-1987.[5] One of the purposes of the Crimes Code is to safeguard offenders against excessive, disproportionate, or arbitrary punishment. 18 Pa.C.S. §104(3). The

---

5. On the other hand, although there was testimony that similarly situated male prisoners had access to work release, the evidence did not suggest that those similarities extended to the point that the males on work release had all killed somebody while driving drunk. In contemplating penal equality, we must not only consider the qualities of the facilities and of the prisoner, we must consider the quality of the crime that caused the defendant to become a convict.

Constitutions speak to that as well. We are merely stating that we may not call her tenuous custodial and occupational situation "work release."

Having thus concluded that the electronic home monitoring home system in which defendant was placed cannot statutorily qualify as "partial confinement" or "work release," we return to the various statutory sentencing alternatives set forth in section 9721(a) of the Sentencing Code. See page 4, supra. The only spot in the statutory scheme where electronic home monitoring can be, with intellectual honesty — i.e., without either ignoring or intentionally misreading clear language in the statute — would appear to fall within either an order of probation, or an order of parole. This is not and cannot be a sentence of probation, because the sentence, by its very terms, was not probationary but contained a minimum-maximum term of imprisonment. Rather, its legal, statutory pigeonhole would properly appear to be parole.[6]

We realize that at first blush it perhaps sounds anomalous to brand electronic home monitoring as "parole," but it is well to recall the precise nature of that status. "A 'parole' is not an act of clemency

---

6. We emphasize that it is not the presence of electronic home monitoring which defines defendant's status as work release. Rather, it is defendant's fact of living dehors the doors of the jail. Her status in that regard can be either parole or probation depending on the structure of the sentence, with electric home monitoring merely being a condition of that parole or probation. There is nothing per se wrong with the use of electronic home monitoring in appropriate circumstances, and indeed, we can envisage considerable effective constructive use of this new correctional tool. We are today simply holding that it may not be used as a condition of parole or probation in the context of a sentencing status that is statutorily precluded in the facts and law of a particular case.

obliterating the crime or forgiving the offender, but is a penalogical measure for disciplinary treatment of prisoners apparently capable of rehabilitation outside the prison, and it does not set aside or affect the sentence." *Commonwealth ex rel. Forsythe v. Myers,* 200 Pa. Super. 636, 189 A.2d 920 (1963). "Furthermore, while parole is a provisional release, it is in legal effect a continuance of imprisonment. . . . Such a person is still in the legal custody of the warden of the institution from which he was paroled and under his control until the expiration of his term of sentence." *Commonwealth ex rel. Johnson v. Bookbinder,* 213 Pa. Super. 335, 338, 247 A. 2d 644 (1968). "The parole of a prisoner . . . is not a matter of right, it is a matter of grace and mercy. . . ." *Commonwealth ex rel. Sparks v. Russell,* 403 Pa. 320, 323, 169 A.2d 884 (1961). These cases describe a legal status embodying the concept of electronic home monitoring to a degree which is uncanny.

## JURISDICTION

The commonwealth has argued in summation that this court lacks jurisdiction to order this defendant to be placed on electronic home monitoring, since that status is legally one of parole, and jurisdiction to place on parole is exclusively with the State Parole Board. So also, defendant, in the second prong of her motion to quash, has averred that since the maximum part of the sentence exceeded two years, the case is within the jurisdiction of the "Board of Corrections of the commonwealth of Pennsylvania" and, as a state prisoner, she is no longer subject to the jurisdiction of this court. Motion to quash, paragraph 4, 10(b). Upon the following reasoning, we are constrained to conclude that we have jurisdiction, but only partially.

The parole statute, notably the Act of August 6, 1941, P.L. 861, §17, as amended, 61 P.S. §331.17, governs the situation and expressly gives the exclusive power to parole defendant to the Pennsylvania Board of Probation and Parole.

"Section 331.17 Powers of board respecting parolees; supervision of persons placed on probation; sentences for less than two years excepted

*"The board shall have exclusive power to parole and reparole, commit and recommit for violations of parole, and to discharge from parole all persons heretofore or hereafter sentenced by any court in this commonwealth to imprisonment in any prison or penal institution thereof,* whether the same be a *state or county penitentiary, prison or penal institution, as hereinafter provided.* It is further provided that the board shall have exclusive power to supervise any person hereafter placed on parole (when sentenced to a maximum period of less than two years) by any judge of a court having criminal jurisdiction, when the court may by special order direct supervision by the board, in which case the parole case shall be known as a special case and the authority of the board with regard thereto shall be the same as herein provided with regard to parole cases within one of the classifications above set forth: *Provided, however, that, except for such special cases, the powers and duties herein conferred shall not extend to persons sentenced for a maximum period of less than two years,* and nothing herein contained shall prevent any court of this commonwealth from paroling any person sentenced by it for a maximum period of less than two years: And provided further, that the period of two years herein referred to shall mean the entire continuous term of sentence to which a person is subject, whether the same be by one or more sentences, ei-

ther to simple imprisonment or to an indeterminate imprisonment at hard labor, as now or hereafter authorized by law to be imposed for criminal offenses. The power of the board to parole shall extend to prisoners sentenced to definite or flat sentences." As amended December 27, 1965, P.L. 1230, §8 (emphasis supplied).

As may be readily observed from the governing statute, it is not this court, but the Pennsylvania Board of Probation and Parole which has exclusive jurisdiction over the power to parole, inter alia, under this sentence, with its maximum of two years and eight months. Legions of cases confirm this statutory truth. *Hendrickson v. Pennsylvania State Bd. of Parole,* 409 Pa. 204, 185 A.2d 581 (1962), cert. denied U.S. 817; *Commonwealth ex rel. Tate v. Burke,* 364 Pa. 179, 71 A.2d 241 (1950), *Commonwealth v. Call,* 249 Pa. Super. 511, 378 A.2d 412 (1977); *Commonwealth v. Yoder,* 249 Pa. Super. 511, 378 A.2d 350 (1977) *Commonwealth v. Gillespie,* 527 A.2d 1061, 1066 (1987); *Tillman v. Com., Pennsylvania Bd. of Probation and Parole,* 48 Pa. Commw. 325, 409 A.2d 949 (1980). But we must scrutinize with care the precise metes and bounds of this exclusive state board jurisdiction to see exactly what it encompasses and what it does not. The statute speaks only of "exclusive power to parole and reparole, commit and recommit for violations of parole, and to discharge from parole." 61 P.S. §331.17.

Traditionally, the sentencing function has been within the exclusive province of the judiciary:

"The whole judicial power of the commonwealth is vested in courts. Not a fragment of it belongs to the Legislature. The trial, conviction, and sentencing of criminals are judicial duties, and the duration or period of the sentence is an essential part of a ju-

dicial judgment in a criminal record. Can it be reversed or modified by a board of prison inspectors acting under legislative authority? If it can, what judicial decree is not exposed to legislative modifications? From what judicial sentence may not the legislature direct deductions to be made if this act be constitutional? What they may do indirectly they may do directly. If they may authorize boards of inspectors to disregard judicial sentences, why may they not repeal them as fast as they are pronounced, and thus assume the highest judicial functions?" *Commonwealth ex rel. Johnson v. Halloway,* 42 Pa. 446, 448 (1862).

That it is the judge who imposes the sentence is set forth with clarity in subchapter E of the Sentencing Code, 42 Pa.C.S. §9751 et seq., as well as the Criminal Rules, Pa.R.Crim.P. 1401. To the extent that the Act of 1941, 61 P.S. §331.17, carves out a jurisdictional niche for the state board, that statute decreases the jurisdiction of this court, a court of record, as established by the Legislature, the Supreme Court, and Article V, section 5 of the Pennsylvania Constitution. Provisions decreasing the jurisdiction of a court of record shall be strictly construed. 1 Pa.C.S. §1928(b)(7). We thus read the jurisdictional province of the state board as encompassing the functions expressly mentioned in the Act of 1941, and no more. Our analysis, then, ineluctably leads to the conclusion that although this court, upon the passage of 30 days following pronouncement of its sentence of a maximum length exceeding two years, divested itself of jurisdiction to parole this defendant by placing her on electronic home monitoring,[7] there was no concomitant

---

7. We had stated from the bench — noting our desire not to visit unequal punishment upon defendant because of the happenstance of her being female, and this county's unfortu-

divestiture of jurisdiction to adjudicate the legal effect of the warden's directive releasing her from prison and placing her on electronic home monitoring and, if legally appropriate, to declare that directive a nullity. That power, not divested by statute, remains with the sentencing court. *Cf: Commonwealth ex rel. Forsythe v. Myers,* supra, 200 Pa. Super. at 639. The only language in the jurisdictional statute that comes at all close to what we are here being asked to do concerning the warden's directive is "the exclusive power . . . to . . . recommit for violations of parole." But we are in no way undertaking that task. No one contends that her comportment on electronic home monitoring has been anything but exemplary, and even if it had been otherwise,

---

nate failure to provide a work release facility to accommodate women, which could well place this case on a collision course with this commonwealth's Equal Rights Amendment, Pennsylvania Constitution, Article I, section 28, as well as the Equal Protection Clause, U.S. Constitution, Amendment XIV — that we would consider placing her on electronic home monitoring, with some additional weekend community service in an admittedly imperfect effort, not unlike the equitable doctrine of cy pres, to try to achieve penal equality with similarly situated male prisoners, who have access to work release. Unfortunately, we now conclude that we lack the power, the jurisdiction, to do this, as we may not parole. The jurisdictional provision of the Act of 1941 is strictly construed and may not be disregarded, even upon stipulation of the parties. *Com. v. Call,* 249 Pa. Super. 511, 378 A.2d 412, 415 (1977). The parties have not expressly asserted unconstitutionality, and we are most mindful of the inappropriateness of our reaching that sua sponte, *Wiegand v. Wiegand,* 461 Pa. 482, 337 A. 2d 256 (1975), or unnecessarily. *Lynch v. Owen J. Roberts School District,* 430 Pa. 461, 244 A.2d 1 (1968). Thus, we expressly have not reached the constitutional questions obliquely touched upon during argument. We nevertheless, of course, always seek to adjudicate any case in keeping with both the law and the Constitution.

we would not presume to essay the task of assessing whether she had violated her parole to a degree requiring recommitment. We are merely being called upon to determine whether the decision placing her on parole was lawful. That we may do.

*The Legal Status of the Warden's "Order" Placing Defendant on Electronic Home Monitoring on July 1, 1987*

The commonwealth argues that the warden lacked the legal authority for him personally, without even consulting with the district attorney or the sentencing judge, nor, a fortiori, obtaining the court's approval, to have placed defendant on electronic home monitoring. The defense argues that the warden in this county has traditionally — for at least over a decade — exclusively made the decision of whether a defendant is to be placed on work release, and that since this situation is one of work release, the warden, by custom and tradition, acted within the purview of his authority. For the reasons discussed above, we having determined that electronic home monitoring does not legally constitute work release, but rather, is a form of early parole, defendant's syllogism must fail.

We do observe parenthetically that even if our analysis of that statutory scheme be found legally wanting and electronic home monitoring be ultimately found to fall within the definition of work release, it is not the warden, but the court, to which the Legislature has granted the exclusive authority to order work release when a defendant is serving a term of imprisonment in a county jail. The Act of August 13, 1963, 61 P.S. §2141, set forth fully at pages 5 and 6, supra, expressly so proclaims. Although this language, standing alone, is clear, it has received judicial affirmation of its clarity. In

*Commmonwealth v. Hearn,* 34 D.&C.2d 49 (1964), Judge (now Chief Judge) Fullam concluded that a prisoner who absconded. from his employment while on work release could be convicted of prison breach under the Penal Code of 1939, 18 P.S. §4309. In discussing the case, however, he noted: "Defendant, while serving a sentence in the Bucks County Prison, was admitted to the work-release program by appropriate order of the sentencing judge, as authorized by the Act of August 13, 1963, P.L. 774 . . . ." He writes further, discussing the necessity and appropriateness of a court order under the governing statute. Obviously, in our sister county of Bucks, the statute was known and followed.

It is true, however, that in this county, that act has for some time been honored in the breach, no doubt unknowingly. It was until recently a long-standing custom, approved by a succession of president judges of this judicial district, leaving work release decisions within the exclusive province of the warden. But that a statute lies fallow and unused,[8] apparently forgotten, quietly tucked away in some arcane pocket part of Purdon's, does not cause its implied repeal. There is no doctrine of statutory desuetude in this commonwealth. 1 Pa.C.S. §1973. Indeed, we observe that the Legislature had not forgotten the statute, having reaffirmed its vitality in a 1982 amendment to 42 Pa.C.S. §9756, reiterating "the authority of the court as set forth in the Act of August 13, 1963, P.L. 774, as amended, relating to prisoner release for occupational and other purposes." In any event, the statute has been found, and may not be ignored. The warden's directive

---

8. We infer that the recent unearthing of this provision in this county came as a result of some intense legal research prompted by this electronic home monitoring controversy.

clearly ran afoul of that law, and even though his directive was undoubtedly done unwittingly, and with the approval of the Chester County Prison Board,[9] it may not be permitted to stand.

## DISPOSITION OF DEFENDANT

Having determined the warden's directive to place defendant on electronic home monitoring to be a nullity, we have placed her on nominal bail, continuing her nevertheless on electronic home monitoring (which she offered to do voluntarily) until this case achieves resolution as to how she is to serve the remainder of her sentence. Our hands are tied as to formally placing her on electronic home monitoring; that would have to come from the parole board. Thus, our options are two-fold: remand her to the prison, or place her on work release.

At hearing, testimony was adduced[10] that in bargains of this sort, the constant custom in this county was that the term "imprisonment" was construed so as to permit defendant's being sent to the work release facility in West Chester after serving some time in jail. As mentioned, there are similarly situated male defendants who have been afforded this within our penal system. Because of the absence of equivalent female facilities, it is physically impossi-

---

9. On September 15, 1986, the Chester County Prison Board approved a six-month trial period for electronic home monitoring to be used at the warden's discretion, said approval coming upon motion of the president judge, with the district attorney abstaining.

10. This was done upon the theory that to the extent there may be some ambiguity in the term "imprisonment" as set forth in the plea agreement, which, after all, is a contract, the parol evidence rule does not preclude such clarifying testimony. See generally: Packel & Poulin, Pennsylvania Evidence, §422.3, and cases collected therein.

ble for us today so to direct. This is unfortunate, because that would be our inclination. We recognize, as well, that the work release conditions in the Delaware County Prison are somewhat more arduous than those in the Chester County system. Working within our jurisdiction, however, as we must, we conclude that we have no other recourse insofar as we might wish to ameliorate and thus somewhat equalize her sentence, than to send her to the work release facility in our sister county of Delaware to serve the remainder of her term. In an effort to approximate as closely as possible the quality of time served, we respectfully suggest to the state board that when this defendant's minimum is reached, that they give serious consideration to giving her credit for time served under the electronic home monitoring system. Giving her compensatory time for the more liberal context in which she has been living the past several months would tend, in our view, to counterbalance the time spent in the harsher facilities in which she is to spend the evenings during the remainder of her sentence before being paroled. We realize this result is only approximate[11] and therefore is by no means entirely satisfactory. However, we can only strive, as best we can, to mete out equal justice under law.

Accordingly, we make the following

## ORDER

And now, this October 8, 1987, defendant is directed to report to the Delaware County Prison at

---

11. It is also approximate in that the record is unclear as to the relative gravity of the crimes of these so-called similarly-situated prisoners, as compared to the vehicular homicide at bar. Under all the circumstances in this case, we cannot conclude that this result constitutes a penal inequity. If anything, she has been fortunate.

Broadmeadows to serve the remainder of her sentence on work release, there to await an order of parole from the proper paroling authority, the state Board of Probation and Parole. She is to resume her presence on said work release program not later than noon, Wednesday, October 14, 1987, at a time most convenient for defendant and for the authorities. A copy of this opinion and order shall be sent to the state Board of Probation and Parole.