Erik C. RISE; David R. Durham; Jeffery F. Rhodes; David A. English; and Michael Milligan, Plaintiffs–Appellants,

v.

STATE OF OREGON; Fred Pearce; Director, Department of Corrections; Department of State Police; Reginald B. Madsen, Superintendent, Department of State Police; Catherine Knox, Administrator, DOC Health Services Department; and John Does 1–25, DOC employees implementing Chapter 669, Defendants–Appellees.

No. 93–35521.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1994.

Decided July 18, 1995.

## I

Chapter 669, Oregon Laws 1991, O.R.S. §§ 137.076, 161.325(4), 181.085, 419.507(11), and 419.800(4)(k), requires persons convicted of murder, a sexual offense,[1] or conspiracy or attempt to commit a sexual offense to submit a blood sample to the Oregon Department of Corrections ("DOC"). O.R.S. § 137.076. DOC uses the blood that is submitted to create a deoxyribonucleic acid (DNA) data bank. Plaintiffs Erik Rise, David Durham, and Jeffery Rhodes were convicted before the enactment of Chapter 669 of one or more of the offenses to which the Chapter applies. Plaintiff Michael Milligan was convicted of attempted murder, which is not a predicate offense under Chapter 669.

The plaintiffs allege that Chapter 669 violates the Fourth Amendment's prohibition against unreasonable searches and seizures and constitutes an ex post facto punishment as applied to them because they were convicted prior to the law's enactment. They also maintain that the Due Process Clause requires the defendants to provide a hearing before drawing blood pursuant to Chapter 669. Finally, 'plaintiff Milligan alleges that the defendants violated his right to due process by ordering him to submit a blood sample even though he had not been convicted of a predicate offense and by placing him in administrative segregation when he refused to comply.

We review de novo the district court's grant of summary judgment. *Jones v. Union Pacific R.R.*, 968 F.2d 937, 940 (9th Cir.1992). In doing so, we view the evidence in the light most favorable to the plaintiffs and determine whether the district court applied the relevant substantive law correctly and whether any genuine issues of material fact exist for trial. *Tzung v. State Farm Fire and Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989).

## II

■ Non-consensual extraction of blood implicates Fourth Amendment privacy

Jeff Dominic Price, Los Angeles, CA, for plaintiffs-appellants.

Robert Atkinson, Asst. Atty. Gen., Salem, OR, for defendants-appellees.

Before: FLETCHER, NELSON and RYMER, Circuit Judges.

Opinion by Judge FLETCHER; Dissent by Judge D.W. NELSON.

FLETCHER, Circuit Judge:

The plaintiffs in this 42 U.S.C. § 1983 suit appeal the district court's summary judgment dismissing their claims. We have jurisdiction and affirm.

---

**1.** Chapter 669 includes as predicate offenses the following sex-related crimes: rape, sodomy, unlawful sexual penetration, sexual abuse, public indecency, incest, using a child in a display of sexually explicit conduct, and promoting or compelling prostitution. O.R.S. § 137.076(1). We refer to them collectively as "sexual offenses."

rights. *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989) ("this physical intrusion, penetrating beneath the skin, infringes [a reasonable] expectation of privacy"); *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966) (compulsory blood test "plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment"). To hold that the Fourth Amendment applies to the blood sampling authorized by Chapter 669, however, is only the start of our inquiry, "[f]or the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414; *accord Vernonia School District 47J v. Acton,* — U.S. —, — – —, 115 S.Ct. 2386, 2389–90, 132 L.Ed.2d 564 (1995) ("the ultimate measure of the constitutionality of a governmental search is 'reasonableness' "). A search's reasonableness under the Fourth Amendment generally depends on whether the search was made pursuant to a warrant issued upon probable cause. *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983). The plaintiffs maintain that because Chapter 669 requires them to submit blood samples without warrants and without probable cause to believe that they have committed any unsolved criminal offenses, it violates the Fourth Amendment's prohibition against unreasonable searches and seizures. We do not agree.

### A

The district court held that Chapter 669 was constitutional because it served a "special need" other than normal law enforcement, *see, e.g., New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), and was related to effective penal administration, *see, e.g., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The plaintiffs maintain that the "special needs" doctrine and the so-called "prison inmate" exception to the warrant and probable cause requirements do not apply because Chapter 669's sole purpose is to assist in the arrest and prosecution of suspected criminals. We need not determine whether Chapter 669 also serves legitimate penal interests, as the defendants argue, because we find that the statute is constitutional even if its only objective is law enforcement. *See Marino v. Vasquez,* 812 F.2d 499, 508 (9th Cir.1987) (appellate court can affirm "on any ground finding support in the record, even if the district court relied on the wrong grounds or wrong reasoning").

■ Even in the law enforcement context, the State may interfere with an individual's Fourth Amendment interests with less than probable cause and without a warrant if the intrusion is only minimal and is justified by law enforcement purposes. *E.g., Michigan State Police Department v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990); *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). To determine whether the intrusions authorized by Chapter 669 are minimal, we examine separately the privacy interests implicated by the state's derivation and retention of identifying DNA information from a convicted felon's blood, and the interest in bodily integrity implicated by the physical intrusion necessary to obtain the blood sample.

■ The gathering of genetic information for identification purposes from a convicted murderer's or sexual offender's blood once the blood has been drawn does not constitute more than a minimal intrusion upon the plaintiffs' Fourth Amendment interests. The information derived from the blood sample is substantially the same as that derived from fingerprinting—an identifying marker unique to the individual from whom the information is derived. The gathering of fingerprint evidence from "free persons" constitutes a sufficiently significant interference with individual expectations of privacy that law enforcement officials are required to demonstrate that they have probable cause, or at least an articulable suspicion, to believe that the person committed a criminal offense and that the fingerprinting will establish or negate the person's connection to the offense. *See Hayes v. Florida,* 470 U.S. 811, 813–18, 105 S.Ct. 1643, 1645–47, 84 L.Ed.2d 705 (1985);

*Davis v. Mississippi,* 394 U.S. 721, 726–28, 89 S.Ct. 1394, 1397–98, 22 L.Ed.2d 676 (1969). Nevertheless, everyday "booking" procedures routinely require even the merely accused to provide fingerprint identification, regardless of whether investigation of the crime involves fingerprint evidence. *See Smith v. United States,* 324 F.2d 879, 882 (D.C.Cir.1963) (Burger, J.) ("it is elementary that a person in lawful custody may be required to submit to . . . fingerprinting . . . as part of the routine identification processes"); *Napolitano v. United States,* 340 F.2d 313, 314 (1st Cir.1965) ("Taking fingerprints [prior to bail] is universally standard procedure, and no violation of constitutional rights."). Thus, in the fingerprinting context, there exists a constitutionally significant distinction between the gathering of fingerprints from free persons to determine their guilt of an unsolved criminal offense and the gathering of fingerprints for identification purposes from persons within the lawful custody of the state.

■ A similar, but even more compelling, distinction is applicable here. Although the drawing of blood from free persons generally requires a warrant supported by probable cause to believe that a person has committed a criminal offense and that his blood will reveal evidence relevant to that offense, *see Schmerber,* 384 U.S. at 768–71, 86 S.Ct. at 1834–36; *United States v. Chapel,* 55 F.3d 1416, 1418–19 (9th Cir.1995) (en banc), the absence of such a warrant does not *a fortiori* establish a violation of the plaintiffs' Fourth Amendment rights. Chapter 669 authorizes DOC to acquire blood samples not from free persons or even mere arrestees, but only from certain classes of convicted felons in order to create a record for possible use for identification in the future. These persons do not have the same expectations of privacy in their identifying genetic information that "free persons" have. Once a person is convicted of one of the felonies included as predicate offenses under Chapter 669, his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from the blood sampling.

That the gathering of DNA information requires the drawing of blood rather than inking and rolling a person's fingertips does not elevate the intrusion upon the plaintiffs' Fourth Amendment interests to a level beyond minimal.[2] The Supreme Court has noted repeatedly that the drawing of blood constitutes only a minimally intrusive search. *Skinner,* 489 U.S. at 625, 109 S.Ct. at 1417 (blood tests do not "infringe significant privacy interests"); *Winston v. Lee,* 470 U.S. 753, 762, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662 (1985) (not "an unduly extensive imposition"); *Schmerber,* 384 U.S. at 771, 86 S.Ct. at 1836 ("commonplace"); *Breithaupt v. Abram,* 352 U.S. 432, 436, 77 S.Ct. 408, 410, 1 L.Ed.2d 448 (1957) ("routine" and "would not be considered offensive by even the most delicate").

### B

Because Chapter 669 authorizes only a minimal intrusion into the plaintiffs' Fourth Amendment interests, determining its constitutionality requires us to balance the gravity of the public interest served by the creation of a DNA data bank, the degree to which the data bank would advance the public interest, and the severity of the resulting interference with individual liberty. *Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979).

**2.** The dissent suggests that our comparison to traditional fingerprinting is inapt because fingerprints "are personal attributes that are routinely exposed to the public at large in daily life" and, accordingly, the gathering of fingerprints, unlike the drawing of blood, implicates "a categorically different and lesser expectation of privacy." Dissenting Op. at 1569. However, the fingerprints gathered by law enforcement officials and included in fingerprint identification data banks are not ones that have been left behind voluntarily on doorknobs and water glasses. They are the ones gathered by holding the person's hand firmly and taking the prints. Much like the process of providing a blood sample, providing one's fingerprints can be quick and simple if one submits voluntarily, but has the potential for the use of force if resisted. It is for this reason that, outside the "booking" process to which we analogize, courts *do* generally require some level of individualized suspicion to support the seizure necessary to gather a person's fingerprints. *See Hayes,* 470 U.S. at 813–18, 105 S.Ct. at 1645–47; *Davis,* 394 U.S. at 726–28, 89 S.Ct. at 1397–98.

■ The Fourth Circuit has upheld the State of Virginia's statute authorizing the extraction of blood from convicted felons to create a DNA identification data bank as a reasonable intrusion. *See Jones v. Murray*, 962 F.2d 302 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992).[3] Oregon's statute, narrower than Virginia's, applying only to certain classes of felons, bears a rational relationship to the public's interest in identifying and prosecuting murderers and sexual offenders. The defendants produced uncontroverted evidence documenting the high rates of recidivism among certain types of murderers and sexual offenders. Moreover, investigations of murders and sexual offenses are more likely to yield the types of evidence from which DNA information can be derived, such as blood, semen, saliva, and hair evidence, than property crimes or other offenses committed without substantial personal contact. Taken together, these two facts suggest that a data bank of DNA information derived from the blood of convicted murderers and sexual offenders will help the state to identify and prosecute the perpetrators of future offenses.[4] The creation of a DNA data bank also advances the overwhelming public interest in prosecuting crimes *accurately*—DNA evidence can exculpate an accused just as effectively as it can inculpate him.

Chapter 669 applies only to persons actually convicted of murder or a sexual offense and requires no more than one blood extraction from an individual in his lifetime. O.R.S. § 137.076(4)(a) (exempting convicted person from blood draw if DOC already has an adequate sample). Blood samples can be taken only in a medically acceptable manner by appropriately trained medical personnel, and a convicted person is not required to submit a blood sample if doing so would present a substantial and unreasonable risk to his health. O.R.S. § 137.076(3), (4)(b).

Chapter 669 also limits the State's use of blood samples taken pursuant to the Chapter. Only district attorneys, courts, grand juries, certain law enforcement officers, and parties to a criminal prosecution may be privy to the information derived from the blood sample, O.R.S. § 181.085(2), and the State may not analyze the samples to discover genetic predispositions to physical or mental conditions.[5]

The absence of any individualized suspicion that persons subject to blood sampling have committed criminal offenses other than their original offenses of conviction does not render Chapter 669 unconstitutional. Rather, the evenhandedness of Oregon's statute contributes to its reasonableness. "An essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents." *Skinner*, 489 U.S. at 621–22, 109 S.Ct. at 1415–16 (holding that a warrant was not required in part because "in light of the standardized nature of the tests

---

**3.** Several state and federal district courts also have upheld state statutes authorizing prison officials to obtain blood samples from convicted persons for purposes of creating DNA data banks. *See Vanderlinden v. Kansas*, 874 F.Supp. 1210, 1214–15 (D.Kan.1995); *Sanders v. Coman*, 864 F.Supp. 496, 499 (E.D.N.C.1994); *Ryncarz v. Eikenberry*, 824 F.Supp. 1493, 1498–99 (E.D.Wa. 1993); *People v. Wealer*, 264 Ill.App.3d 6, 201 Ill.Dec. 697, 703, 636 N.E.2d 1129, 1135 (1994); *In re Orozco*, 129 Or.App. 148, 878 P.2d 432, 435 (1994); *State v. Olivas*, 122 Wash.2d 73, 856 P.2d 1076, 1085–86 (1993).

**4.** Additionally, the defendants maintain that Chapter 669 may reduce recidivism because released murderers and sexual offenders will be reluctant to commit other offenses out of fear that they will leave behind incriminating evidence that could be linked back to them through the state's DNA data bank. If so, the creation of a DNA data bank certainly is less drastic than other methods currently being used in the growing war to reduce recidivism, particularly among sexual offenders. *See generally* Barry Meier, *"Sexual Predators" Finding Sentence May Last Past Jail*, New York Times, Feb. 27, 1995, at A1 (reporting an increase in state legislation aimed at reducing recidivism by sexual offenders, including statutes requiring sexual offenders to register with local authorities upon relocation to a new community and legislation providing for involuntary civil commitment upon a sexual offender's release from prison).

**5.** State officials may use the blood samples for only one purpose other than a DNA identification bank. Under O.R.S. § 181.085(1)(d), the blood samples may be used to create a statistical population frequency data bank on the condition that the information be stored on an anonymous basis.

and the minimal discretion vested in those charged with administering the program, there are virtually no facts for a neutral magistrate to evaluate").

The Supreme Court recently reaffirmed and expanded the principle first enunciated in *Skinner,* stating that, in some contexts, "testing based on 'suspicion' of [wrongful activity] would not be better, but worse" than suspicionless testing. *Acton,* —— U.S. at ——, 115 S.Ct. at 2396. In *Acton,* the Supreme Court upheld as constitutional a school district's practice of conducting random, suspicionless urine testing of school athletes for drug use. The Court rejected the proposition that the school district could conduct such testing only if school officials had suspicion that a specific athlete was using drugs, holding that this alternative "entails substantial difficulties—if it is indeed practicable at all." *Id.* Accusatory drug testing would "transform[ ] the process into a badge of shame" and would increase the risk that school officials would impose testing arbitrarily upon disfavored, but not drug-using, students. *Id.*

Like the testing programs at issue in *Skinner* and *Acton,* Chapter 669 is evenhanded. Every person convicted of one of the predicate offenses listed in O.R.S. § 137.076(1) is required to submit a blood sample for analysis unless a court determines that drawing a sample would create a substantial and unreasonable risk to the person's health. Prison officials retain no discretion to choose which persons must submit blood samples. By ensuring that blood extractions will not be ordered randomly or for illegitimate purposes, Chapter 669 fulfills a principal purpose of the warrant requirement.

Taking into account all of the factors discussed above—the reduced expectations of privacy held by persons convicted of one of the felonies to which Chapter 669 applies, the blood extractions' relatively minimal intrusion into these persons' privacy interests, the public's incontestable interest in preventing recidivism and identifying and prosecuting murderers and sexual offenders, and the likelihood that a DNA data bank will advance this interest—we conclude that Chapter 669 is reasonable and therefore constitutional under the Fourth Amendment.

### III

The plaintiffs maintain that, even if Chapter 669 is constitutional as applied to persons convicted after its enactment, it violates the prohibition against ex post facto laws as applied to them because they were convicted prior to its enactment. The district court held that Chapter 669 does not subject the plaintiffs to increased punishment and therefore does not implicate ex post facto concerns. We agree.

■ Not every change in a convicted person's situation violates the Ex Post Facto Clause. A law implicates the Ex Post Facto Clause only if it criminalizes conduct that was not a crime when it was committed, increases the punishment for a crime beyond what it was at the time the act was committed, or deprives a person of a defense available at the time the act was committed. *Collins v. Youngblood,* 497 U.S. 37, 42–43, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990). Because Chapter 669 does not amend Oregon's substantive criminal laws, it raises ex post facto concerns only if requiring the plaintiffs to submit a blood sample for a DNA data bank constitutes "punishment."

■ We have held that legislation may lawfully impose new requirements on convicted persons if the statute's "overall design and effect" indicates a "non-punitive intent." *United States v. Huss,* 7 F.3d 1444, 1447 (9th Cir.1993). Because Chapter 669's obvious purpose is to create a DNA data bank to assist in the identification, arrest, and prosecution of criminals, not to punish convicted murderers and sexual offenders, it does not violate the prohibition against ex post facto punishment.

### IV

■ The plaintiffs argue that the Due Process Clause requires prison officials to provide a hearing before requiring a person to submit a blood sample pursuant to Chapter 669. We do not agree. The extraction of blood from an individual in a simple, medically acceptable manner, despite the individual's

lack of an opportunity to object to the procedure, does not implicate the Due Process Clause. *Schmerber*, 384 U.S. at 759–60, 86 S.Ct. at 1829–30 (upholding withdrawal of blood despite defendant's refusal to consent); *Breithaupt*, 352 U.S. at 435, 77 S.Ct. at 410 (upholding blood extraction from unconscious person). Because the only criterion under Chapter 669 for extracting blood is a conviction for a predicate offense, there would be little of substance to contest at any provided hearing.

## V

Milligan presents a separate due process claim from that of his co-plaintiffs. He alleges that prison officials violated his due process rights by ordering him to submit a blood sample pursuant to Chapter 669 even though he did not commit an offense listed in O.R.S. § 137.076(1). It is undisputed that Milligan was convicted of attempted murder and unlawful use of a weapon, which are not predicate offenses under § 137.076(1). Nevertheless, prison officials ordered him at least three times to submit a blood sample. Milligan refused to submit a sample, and two hearings were held to determine whether Milligan should be disciplined. At neither hearing did Milligan claim that Chapter 669 did not apply to him. As a result of his refusal to provide a blood sample, Milligan was sanctioned, fined, and placed in disciplinary segregation.

Crittenden Tuttle, the DOC employee who recommended that a blood sample be drawn from Milligan,[6] submitted an uncontroverted affidavit to the district court explaining that the recommendation resulted from a mistaken interpretation of O.R.S. § 137.076(1), which includes as predicate offenses:

"(d) *Conspiracy or attempt to commit* any felony listed in paragraphs (a) to (c) of this subsection; or

"(e) *Murder or aggravated murder.*"

(emphasis added). Apparently, the "attempt to commit" language was interpreted as applying not only to the offenses incorporated

in subsection (d) but also to murder and aggravated murder, listed in subsection (e).

The district court granted the defendants' motion for summary judgment on Milligan's due process claim on several grounds. Milligan does not appeal the bases on which the district court entered summary judgment in favor of DOC, the Department of State Police, Reginald Madsen, and the John Doe defendants. Therefore, Milligan's appeal challenges only the district court's decision to enter summary judgment in favor of defendants Catherine Knox, Administrator of the DOC Health Service Department, and Fred Pearce, Director of DOC. The district court granted summary judgment in favor of these defendants because the misreading of O.R.S. § 137.076(1) was at most negligent and, therefore, was not actionable under 42 U.S.C. § 1983. *See Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). We affirm but on different grounds.

It is well established that section 1983 does not impose liability upon state officials for the acts of their subordinates under a respondeat superior theory of liability. *Monell v. Department of Social Services of New York*, 436 U.S. 658, 691–94, 98 S.Ct. 2018, 2036–37, 56 L.Ed.2d 611 (1978). Rather, state officials are subject to suit under section 1983 only if "they play an affirmative part in the alleged deprivation of constitutional rights." *King v. Atiyeh*, 814 F.2d 565, 568 (9th Cir.1987). Although Milligan alleged that Knox and Pearce were responsible for "implementing" Chapter 669, he failed to produce even a shred of evidence suggesting that either Knox or Pearce was involved personally in the mistaken interpretation of O.R.S. § 137.076 which led to Tuttle's recommendation that Milligan's blood be drawn pursuant to Chapter 669. In light of Milligan's failure to show a causal connection between any conduct taken by either Knox or Pearce and the order that he provide a blood sample, the district court's grant of summary judgment in favor of these defendants was proper. We are not called upon to decide whether allegations if made against the per-

---

**6.** Neither Tuttle nor the employees who disciplined Milligan were named as defendants in this suit.

sons responsible for the mistaken order would have been sufficient to show a cognizable deprivation of Milligan's right to due process.

## VI

We hold that a state does not violate the Fourth Amendment by requiring convicted murderers and sexual offenders to submit a blood sample for DNA analysis to create an identification data bank. We further hold that applying this requirement to persons convicted prior to Chapter 669's enactment does not violate the prohibition against ex post facto punishment. The defendants' procedural due process claims also fail. The state need not conduct a hearing prior to drawing a blood sample pursuant to Chapter 669. As to Milligan's separate claim, he failed to show that either Pearce or Knox was involved personally in the demand that Milligan submit a blood sample. The district court's grant of the defendants' motion for summary judgment is affirmed.

AFFIRMED.

D.W. NELSON, Circuit Judge, dissenting:

The majority fails to find a Fourth Amendment violation arising from the nonconsensual DNA genetic pattern analysis of persons convicted for murder or various sexual offenses (including such non-violent crimes as public indecency or pimping, or attempts at any of the included sexual offenses). Ostensibly applying a traditional balancing test that weighs the severity of the intrusion on personal privacy interests against the importance of the public interest served, the majority upholds extraction and analysis of blood samples, *without any showing of probable cause or even individualized suspicion,* solely for the ordinary law enforcement purpose of facilitating investigation of crimes that may be committed in the future. In reaching this conclusion, the majority brushes aside Supreme Court and Ninth Circuit precedent that recognizes invasion of the body as an intrusion of a scope fundamentally different from the capture of visual images or fingerprints, in which there is a minimal expectation of privacy because that information ordinarily is held out to the public. Be-

cause there is no justification for this unprecedented departure from settled Fourth Amendment jurisprudence, I respectfully dissent.

## I. FORCED EXTRACTION OF BLOOD IS AN INVASION OF BODILY INTEGRITY THAT CANNOT BE CONSIDERED A DE MINIMIS SEIZURE IN THE LAW ENFORCEMENT CONTEXT

Focusing on the Supreme Court's discussion of the routine and commonplace *manner* of the blood extraction process, the majority minimizes the import of *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), erroneously concluding that the *scope* of the search is a de minimis concern. The *Schmerber* Court, however, considered such an intrusion into bodily integrity to be so significant that it normally would require a warrant supported by probable cause. *Id.* at 770, 86 S.Ct. at 1835. Except in certain narrowly limited cases, the Court repeatedly has stated its "insist[ence] upon probable cause as a *minimum* requirement for a reasonable search permitted by the Constitution." *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970) (emphasis added). Because "[t]he integrity of an individual's person is a cherished value in our society," searches that invade bodily integrity cannot be executed as mere fishing expeditions to acquire useful evidence: "The interests in human dignity and privacy which the Fourth Amendment protects forbid *any* such intrusions on the mere chance that desired evidence might be obtained." *Schmerber,* 384 U.S. at 772, 769–770, 86 S.Ct. at 1836, 1835 (emphasis added).

Only when law enforcement faces an exigent circumstance, such as a need to preserve evanescent blood alcohol evidence, and has probable cause to link the sought-after information to a crime under investigation is it constitutional to conduct non-consensual blood testing without a warrant. *Id.* at 770–771, 86 S.Ct. at 1835–36. Therefore, forced extraction of blood not only "implicates the Fourth Amendment," as the majority notes, but also falls squarely within the area of

privacy interests for which the traditional probable cause requirement determines reasonableness in the law enforcement context. Forced blood extraction intrudes on the private personal sphere and infringes upon an individual's "most personal and deep-rooted expectations of privacy." *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662 (1985).

To buttress its claim that a blood test raises de minimis Fourth Amendment concerns, the majority cites to selective descriptive phrases in various Supreme Court opinions in which the Court has analyzed some facet of blood testing. For example, *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), a case decided a decade before *Schmerber,* involved facts substantially similar to those in *Schmerber.* Seeking evidence connected to an accident in which three lives were lost, police had hospital attendants extract blood from an intoxicated driver whose breath smelled of liquor and whose vehicle contained a half-empty bottle of whiskey. *Id.* at 433, 77 S.Ct. at 409. The Court did not consider the Fourth Amendment claim because the state had not adopted the exclusionary rule. *Id.* at 434, 77 S.Ct. at 409. The *Breithaupt* Court concluded that blood testing was sufficiently "routine" not to be considered "brutal" or "offensive" under the *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), "shock the conscience" due process standard for evaluating particular sources of evidence. 352 U.S. at 434–36, 77 S.Ct. at 409–10. Clearly, this language should not be extracted from this "shock the conscience" context as support for a conclusion that blood extraction involves a de minimis intrusion in the context of ordinary law enforcement searches.

Likewise, the majority overlooks the significant constitutional line drawn by *Schmerber* itself for "searches involving intrusions beyond the body's surface." *Schmerber v. California,* 384 U.S. 757, 769, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966). The *Schmerber* Court posed two questions: (1) whether the police were justified in imposing a nonconsensual blood test and (2) whether the procedures themselves were reasonable. *Id.* at 768, 86 S.Ct. at 1834. In answering the first question, the Court recognized that it was "writ[ing] on a clean slate" regarding the treatment of searches that involve intrusions into the human body. *Id.* at 767–68, 86 S.Ct. at 1833–34. It concluded that such searches require probable cause. *Id.* at 770–71, 86 S.Ct. at 1835–36. Its comment on the "commonplace" nature of blood extraction arose in answer to the second question—whether the means employed to secure the blood evidence were reasonable. *Id.* at 771, 86 S.Ct. at 1836. Thus, the Court concluded that the intrusion was sufficiently minimal to permit use of nonconsensual blood testing *when there is probable cause* to believe that the test will produce evidence linking the perpetrator to the crime under investigation.

Similarly, the Supreme Court in *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), recognized that *Schmerber*'s threshold standard was a requirement of probable cause "where intrusions into the human body are concerned," which implicate "deep-rooted expectations of privacy." *Id.* at 761, 760, 105 S.Ct. at 1617, 1616. The *Winston* Court then acknowledged "other factors" "*[b]eyond* these standards" that must be considered in determining whether a particular intrusion is reasonable: whether "the procedure threatens the safety or health of the individual" and "the extent of the intrusion upon the individual's dignitary interests." *Id.* at 761, 105 S.Ct. at 1617 (emphasis added). In regard to the *additional* "dignitary" factor (beyond the threshold inquiry of invasion of bodily integrity), the *Winston* Court noted *Schmerber*'s recognition that blood extraction is not "an unduly extensive imposition." *Id.* at 762, 105 S.Ct. at 1617. The Court contrasted this lesser bodily invasion, which the *Schmerber* Court had upheld upon demonstration of probable cause, with the more drastic measure of dangerous surgery to recoup criminal evidence, which the *Winston* Court concluded would *violate* the individual's Fourth Amendment rights *even when supported by probable cause.* Thus again, the context of the quotation demonstrates that the Court places blood extraction squarely within the probable cause requirement because it is an invasion of bodily integrity, while at the same time acknowledging

that it is a less extensive imposition on dignitary interests than surgical removal of a bullet.

Finally, the majority's reliance on *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), is misplaced. There, the Court held that blood testing for drugs as part of "the exercise of supervision" of employees, *"not to assist in the prosecution of employees,* but rather to prevent accidents" in the highly regulated railway industry, is a "special need beyond the normal need for law enforcement." *Id.* at 621, 620, 619, 109 S.Ct. at 1415, 1415, 1414 (internal quotations omitted and emphasis added). In that context, blood tests administered pursuant to the railway regulations do not "infringe significant privacy interests," based on *Schmerber*'s discussion of the *reasonableness of the procedures* used for blood testing. *Id.* at 625, 109 S.Ct. at 1417. *Skinner* is not persuasive here, where the *ordinary law enforcement* purpose of facilitating prosecution of perpetrators of future crimes implicates the ordinary probable cause/individualized suspicion analysis.

Thus, although the majority asserts that Supreme Court precedent treats blood testing as meriting little judicial attention, the appropriate reading of *Schmerber* demonstrates that blood testing is "minimally" intrusive only in the sense that it is a less egregious example of an extremely invasive type of search—those that involve intrusions into bodily integrity. Consequently, the Supreme Court relied on the *Schmerber* analysis when it invalidated a surgical incision to remove a bullet to provide evidence, stating that intrusions into the human body require a "discerning inquiry" *beyond* the "threshold" probable cause requirement. *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662 (1985).

The majority also fails to consider our own precedent, which consistently treats intrusion into bodily integrity as a determinative factor requiring traditional Fourth Amendment protections. In invalidating routine body cavity inspection of arrestees, we stated unequivocally that "*Schmerber* governs *all* searches that invade the interior of the body—whether by a needle that punctures the skin or a visual intrusion into a body cavity." *Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1449 (9th Cir.1991) (emphasis added). "*Schmerber* itself makes clear that the level of suspicion required for a search into the interior of a person's body is (at least outside the prison security and border entry contexts), probable cause." *Id.* We recently reaffirmed the resulting rule that "[b]efore a law enforcement officer may lawfully take a blood sample without consent or a warrant, he or she must have probable cause to believe that the suspect has committed an offense of which the current state of one's blood will constitute evidence." *United States v. Chapel,* 55 F.3d 1416, 1419 (9th Cir.1995) (en banc); *see also Barlow v. Ground,* 943 F.2d 1132, 1139 (9th Cir.1991) (finding a warrantless seizure of a gay arrestee's blood for HIV testing *per se unreasonable,* in the absence of exigent circumstances, even though the arrestee bit a police officer), *cert. denied,* —— U.S. ——, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992).

## II. THE MAJORITY'S JUSTIFICATION FOR VALIDATION OF THE SEIZURE RESTS ON A SHAKY FOUNDATION COBBLED FROM DISPARATE STRANDS OF FOURTH AMENDMENT JURISPRUDENCE AND FAILS TO DISTINGUISH DISPOSITIVE SUPREME COURT AND NINTH CIRCUIT PRECEDENT

The inescapable conclusion is that *Schmerber* and our precedent have conducted the reasonableness balancing and found that extraction of blood, weighed against the traditional law enforcement goal of identifying perpetrators of crimes, requires probable cause. The majority opinion offers five rationales to support its disavowal of the *Schmerber* and *Fuller–Chapel* rule: (1) a rational basis because of the statistical probability of future crimes by recidivists, (2) a minimal intrusion analogous to that of sobriety checkpoint stops on public highways, (3) a lessened expectation of privacy in bodily integrity for convicts, (4) an acceptable use of the information analogous to fingerprinting, and (5) the statute's mandate of an evenhanded approach

that eliminates police discretion. None of these justifications has merit.

First, the majority claims that the balancing test here is different and weighs in favor of the government because the statute's mandated coercive blood testing bears a rational relationship to the public's "incontestable" interest in identifying and prosecuting criminals. Providing the rational link between means and goal is the evidence of recidivism among murderers and some classes of sexual offenders and the fact that perpetrators of murders and some of the listed sexual offenses are likely to leave behind DNA evidence that can be matched against criminal data banks.

The majority cannot distinguish *Schmerber* on this basis, because furthering the public's interest in prosecuting criminals was also the purpose for the blood test in *Schmerber*. In addition, the rational relationship to the goal of prosecuting perpetrators of potential future crimes is certainly more attenuated than the direct relationship of the blood testing in *Schmerber* to the goal of finding evidence of blood alcohol content for use in the prosecution of a drunk driver who has already violated the law. Because *Schmerber* requires probable cause for blood extraction in the latter circumstance, a mere statistical enhancement of future crimesolving capacity is insufficient to tip the Fourth Amendment's reasonableness balance a different way on the same issue. The majority's approach stands Fourth Amendment jurisprudence on its head by suggesting that statistical probabilities of future conduct can suffice in lieu of the probable cause requirement in the traditional law enforcement context.

Second, the majority implicitly likens blood extraction to brief investigatory stops of motorists at sobriety checkpoints, the unique situation in which the Supreme Court has approved suspicionless searches in the traditional law enforcement context. See *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). The *Sitz* Court relied on well-settled law that motorists have a lessened expectation of pri-

vacy regarding stops and visual searches of automobiles on the nation's roadways. *Id.* at 450, 110 S.Ct. at 2485 (explaining the importance of the context of "police stops of motorists on public highways"). At these sobriety checkpoints, which motorists may choose to avoid,[1] only the initial brief stop and preliminary questioning may take place without individualized suspicion: "more extensive field sobriety testing" requires justification. *Id.* at 450–52, 110 S.Ct. at 2485–86. Significantly, even in the context of motorists' lessened privacy expectations, the intrusiveness of blood extraction, because it is a criminal investigation that invades bodily integrity, requires probable cause under *Schmerber*. "[I]n a criminal investigation ... a search for [contraband] goods, even with a warrant, is 'reasonable' only when there is 'probable cause'." *Camara v. Municipal Court*, 387 U.S. 523, 535, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967).

Like the highway sobriety checkpoints, the "special needs beyond normal law enforcement" rationale supports searches on lesser grounds than probable cause only in a very few, carefully tailored regulatory contexts that do not involve apprehension of criminal perpetrators. See, e.g., *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665–66, 109 S.Ct. 1384, 1390–91, 103 L.Ed.2d 685 (1989) (applying the special needs exception to suspicionless quasi-consensual drug testing of Customs Service employees seeking transfer to positions having a direct involvement in drug interdiction). The special needs exception covers testing which "is *not* designed to serve the ordinary needs of law enforcement [because] ... results may *not* be used in criminal prosecution." *Von Raab*, 489 U.S. at 666, 109 S.Ct. at 1391 (emphases added). Even so, a search in the special needs context almost always requires individualized suspicion. See, e.g., *Portillo v. United States Dist. Court*, 15 F.3d 819, 823 (9th Cir.1994) (requiring individualized suspicion for urinalysis testing under the probationer special needs exception). The rare special needs cases which do not require individual-

---

1. Except when the prison security rationale applies, *every* case in which the Supreme Court has upheld Fourth Amendment searches without in-

dividualized suspicion has involved a consensual aspect to the search.

ized suspicion involve persons who *voluntarily* participate in a *highly regulated* context. *See, e.g., Von Raab,* 489 U.S. at 671, 677, 109 S.Ct. at 1394, 1396 (noting that "certain forms of employment may diminish privacy expectations" for the "employees who seek to be promoted" to certain positions); *Vernonia School District v. Acton,* —— U.S. ——, ——, 115 S.Ct. 2386, 2393, 132 L.Ed.2d 564 (1995) (noting that schools are highly regulated and "like adults who choose to participate in a 'closely regulated industry,' students who *voluntarily* participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy") (emphasis added). The majority relies on the traditional law enforcement analysis because there is no basis for asserting such a special need here, but the majority opinion overlooks the centrality of the probable cause standard to the law enforcement analysis. In contrast to the special needs cases, "the probable-cause standard 'is peculiarly related to criminal investigations.'" *Von Raab,* 489 U.S. at 667, 109 S.Ct. at 1392 (internal quotation omitted). Thus, the majority's frequent citations to the *Skinner* and *Acton* special needs rationales provide further evidence of the weakness of their traditional law enforcement balancing analysis.

Third, the majority suggests that a person's status as a convict is sufficient to allow nonconsensual extraction of blood unrelated to securing evidence for use in the prosecution of the individual for the crime for which he or she was convicted, just as status as an arrestee is sufficient to allow fingerprinting. Nonetheless, routine searches that intrude into prisoners' bodies without probable cause may be upheld *only* when the search is undertaken pursuant to a valid prison regulation that is reasonably related to a legitimate penological objective. *Turner v. Safley,* 482 U.S. 78, 87–91, 107 S.Ct. 2254, 2260–62, 96 L.Ed.2d 64 (1987); *see, e.g., Walker v. Sumner,* 917 F.2d 382, 387 (9th Cir.1990) (remanding for evidence of a specific penological objective because "general protestations of concern for the welfare of the citizens of Nevada and the prison community are simply insufficient to render the involuntary seizure of blood specimens, even from prison inmates, constitutionally reasonable"). The

majority does not and cannot rely on this "prison inmate" exception, because the sole purpose of the statute is to facilitate future criminal investigations. The statute allows authorities to conduct the blood test at any time, even immediately prior to the convict's release. *See* Or.Rev.Stat. § 137.076(2)(c). The creation of the data bank has nothing to do with prison administration; in fact, the Department of Corrections indicated at hearings on the proposed legislation that it neither supported nor opposed the bill, and its practice has been to obtain the sample only at the point that the inmate is to be released from its custody. Thus, the statute falls squarely under traditional law enforcement analysis requiring probable cause for invasions of bodily integrity.

Felons enjoy those constitutional rights that are not subject to attenuation because of the security concerns of the prison context. *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979) ("convicted prisoners do not forfeit all constitutional protections by reason of their conviction"); *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 712 (9th Cir.1989) ("Convicted prisoners, no less those suspected of having perpetrated criminal activity, retain some constitutional liberties."); *Tribble v. Gardner,* 860 F.2d 321, 325 (9th Cir.1988) (upholding a denial of qualified immunity when inmate searches were conducted for punitive purposes unrelated to security concerns because "[i]t is now settled law ... that a prisoner loses only those rights that must be sacrificed to serve legitimate penological needs"), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989); *Michenfelder v. Sumner,* 860 F.2d 328, 334 (9th Cir.1988) ("Our circuit's law respects an incarcerated prisoner's right to bodily privacy."). Those retained rights include the protection from unjustified invasions of bodily integrity, including a right not to have blood drawn if there is no evidence of a legitimate penological objective for the search. *See Walker v. Sumner,* 917 F.2d 382, 386–88 (9th Cir.1990) (remanding for a factual determination whether mandatory AIDS testing of prisoners was justified by a specific penological interest in the health, welfare and safety of the prison population).

The *Wolfish* Court upheld certain body cavity searches of inmates only "in light of the central objective of prison administration, safeguarding institutional security." *Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878.[2] Consequently, we have rejected any extension of *Wolfish* beyond the prison security rationale to ordinary criminal investigatory searches of inmates. *See Fuller*, 950 F.2d at 1448. Therefore, status as a convict—and the concomitant fact that a convicted prisoner forfeits some of the expectations of privacy enjoyed by free citizens—cannot justify the majority's abandonment of the constitutional requirements, established by our precedent on blood testing and body cavity searches, for an intrusion into an inmate's bodily integrity.

The majority's rationale ultimately rests on a fourth indefensible premise that, even in the absence of prison regulations to achieve penological objectives, the protections of the Fourth Amendment do not apply to this particular *use* of forced blood extraction of convicted offenders for creation of a criminal identification data bank.[3] Relying on the glib *linguistic* ease with which various commentators categorize DNA genetic pattern analysis as a kind of genetic "fingerprinting," the majority simply asserts that the purpose of identifying future criminal perpetrators makes it possible *constitutionally* to equate a forced blood extraction with a forced fingerprinting.

This premise fails, because the Supreme Court and this circuit have consistently recognized a distinction of constitutional significance between a forced invasion of bodily integrity and fingerprinting. Blood samples for DNA genetic pattern analysis must be extracted by puncturing the skin and withdrawing body fluids. *Schmerber* clearly requires a warrant for that forced blood extraction, unless probable cause combines with exigent circumstances such as the dissipation of blood alcohol evidence. In addition, DNA genetic pattern analysis is even more intrusive than the blood alcohol test, discussed in *Schmerber* and *Skinner*, which revealed only the current blood levels of alcohol and other behavior-altering substances. DNA genetic pattern analysis catalogs uniquely private genetic facts about the individual that should be subject to rigorous confidentiality requirements even broader than the protection of an individual's medical records. *See Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (recognizing the individual's "interest in avoiding disclosure of personal matters").

Conversely, individuals have a categorically different and lesser expectation of privacy in their fingerprints, visual images, or voice prints—even when their production is compelled—because they are personal attributes that are routinely exposed to the public at large in daily life. *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) (finding a lesser expectation of privacy in personal effects that "a person

**2.** The fact that *Wolfish* specifically involved pretrial detainees rather than convicts does not diminish its relevance, because the Court explicitly held that the prison security rationale "applies equally to pretrial detainees and convicted prisoners." *Id.* at 546, 99 S.Ct. at 1878. Only those measures intended as punishment may not be applied to detainees. *Id.* at 537–38, 99 S.Ct. at 1873. In denying the prisoners' ex post facto claim, the majority holds that this blood extraction is not punitive. Hence, our Fourth Amendment precedent regarding intrusions into bodily integrity for arrestees applies as well to protect these convicted felons. *See, e.g., Fuller*, 950 F.2d at 1449.

**3.** The majority claims that invasion of an inmate's bodily integrity is justified because a convict's identity is "a matter of state interest." This analysis begs the question, because DNA information is much more than merely an identi- fying marker. Therefore, the *use* to which the information will be put cannot alone determine whether blood extraction for DNA analysis invades constitutionally significant interests. Today, technology allows us to insert a microchip beneath the skin and later scan the microchip for a positive identification of the individual. Under the majority's analysis, such microchip insertion would be permissible because of its function to identify criminals, even though it violates our precedent regarding the intrusiveness of an invasion of bodily integrity. As technology develops, there may well be other, more intrusive possibilities for verifying an individual's identity. Surely, the Fourth Amendment's proscriptions against search procedures that invade bodily integrity shield the individual from such intrusions, even though the procedures could yield enormously useful fruits for regular law enforcement purposes.

knowingly exposes to the public, even in his own home or office").

> [T]he Fourth Amendment provides no protection for what 'a person knowingly exposes to the public' ... Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world....
>
> *The required disclosure of a person's voice is thus immeasurably further removed from the Fourth Amendment protection than was the intrusion into the body effected by the blood extraction* in *Schmerber.... Rather, this is like the fingerprinting* in *Davis,* ... [which] "involves none of the probing into an individual's private life and thoughts that marks an interrogation or search."

*United States v. Dionisio,* 410 U.S. 1, 14–15, 93 S.Ct. 764, 771–72, 35 L.Ed.2d 67 (1973) (quoting *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), and *Davis v. Mississippi,* 394 U.S. 721, 727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969)) (emphases added). "Fingerprinting"—like the compelled production of other aspects of an individual's identification that are routinely exposed to and superficially observable by the public at large, such as voice prints, handwriting exemplars, and photographs—simply belongs to a different category of search that "represents a much less serious intrusion upon personal security than other types of searches and detentions." *Hayes v. Florida,* 470 U.S. 811, 814, 105 S.Ct. 1643, 1646, 84 L.Ed.2d 705 (1985).[4] The majority's analysis obliterates this critical constitutional distinction between coerced fingerprinting and blood extraction for DNA genetic pattern analysis.

Finally, the majority relies heavily on safeguards arising from statutory mandates, such as the lack of discretion in determining whether to perform a blood test and clear standards defining the class of individuals to whom the statute applies, that are primarily relevant in the special needs context. *See, e.g., Von Raab,* 489 U.S. at 667, 109 S.Ct. at 1391 (noting that a warrant is of less practical value in the regulatory context for which statutory criteria may serve a similar protective function). Blanket searches are unreasonable, however "evenhanded" they may be, in the traditional criminal law enforcement context. *See, e.g., Ybarra v. Illinois,* 444 U.S. 85, 91–92, 92 n. 4, 100 S.Ct. 338, 342, 342 n. 4, 62 L.Ed.2d 238 (1979) (invalidating a blanket patdown search of all patrons in a tavern, even though there was probable cause to search the bartender and the premises). The ill that the Fourth Amendment prevents is not merely the arbitrariness of police discretion to single out individuals for attention, but also the unwarranted domination and control of the citizenry through fear of baseless but "evenhanded" general police searches.

Despite all our precedent recognizing invasion of the body as an intrusion of a scope fundamentally different from the coerced production of photographs, voice prints, or fingerprints in which we have a minimal expectation of privacy, the practical consequence of the majority's opinion is that certain convicts and ex-convicts who have completed their period of incarceration have no Fourth Amendment right to body integrity. This is a direct result of the majority's mistaken conflation of the carefully circumscribed special needs exception for regulatory contexts with traditional law enforcement balancing. It suggests that any class may be targeted for disfavored Fourth Amendment treatment if statistics predict that members of the class are more likely to engage in future criminal behavior than are other groups of citizens. *Cf. State ex rel. Juvenile Dep't v. Orozco,* 129 Or.App. 148, 878 P.2d 432, 442 (1994) (Haselton, J., dissenting).

In ruling today that persons who have been convicted of particular crimes may be forced to submit to a blood test that may assist in apprehending perpetrators of potential future crimes, the majority takes an un-

---

4. Even so, investigative detention for fingerprinting is not valid unless it is supported by probable cause or reasonable suspicion that it will "establish or negate the suspect's connection" to the crime committed. *Id.* at 817, 105 S.Ct. at 1647.

warranted and significant step in diminishing the Fourth Amendment protection to the "right of the people to be secure in their persons ... against unreasonable searches and seizures." The essence of that protection is a prohibition against some modes of law enforcement because the cost of police intrusion into personal liberty is too high, even though the intrusion undoubtedly would result in an enormous boon to the public if the efficient apprehension of criminals were the sole criterion to be considered. "The easiest course for [law enforcement] officials is not always one that our Constitution allows them to take." *Wolfish*, 441 U.S. at 595, 99 S.Ct. at 1903 (Stevens, J., dissenting). Because the majority has sacrificed a precious constitutional protection in the name of greater police efficiency, and has done so in a way that disregards our own precedents, I respectfully dissent.

