# The Commonwealth *ex rel.* Johnson *versus* Halloway.

## Same *ex rel.* Langhammer *versus* Same.

*Constitutional Law.—Act of* 1861 *allowing deduction from Term of Imprisonment on account of good Conduct, unconstitutional.—Supreme Court will not interfere with the Conduct of Public Officers to whom discretionary powers are allowed by law.*

1. The Act of Assembly of May 1st 1861, providing for a graduated deduction from the term of imprisonment for which a prisoner is sentenced to the State Penitentiary, as a reward for good conduct, is an interference with the judgment of the court sentencing the criminal, and it is therefore unconstitutional.

2. Where in the act a measure of discretion was left to the inspectors of the Penitentiary, in carrying out its provisions, and in the execution of that discretion, they declined to discharge the prisoners or to execute the act, on the ground that public justice would not be promoted thereby, the Supreme Court will not control that discretion, if the reasons assigned by the inspectors are such as justify their course.

In the Supreme Court of Pennsylvania.

These were writs of *habeas corpus* sued out by William Johnson and Charles Langhammer, two prisoners held in confinement in the penitentiary for the Eastern District of Pennsylvania, who claimed discharge from confinement under the provisions of the Act of Assembly passed May 1st 1861, entitled "An Act relative to prison discipline," which provides for a "graduated deduction from the term of sentence," on certain conditions therein contained, and which will be found in the opinion of this court.

No printed argument was furnished by the counsel concerned in these cases.

The opinion of the court was delivered, April 21st 1862, by

WOODWARD, J.—A penitentiary on the principle of solitary confinement of convicts, was first provided for in Pennsylvania by an Act of Assembly of 3d March 1818, which established it in Allegheny county. By an Act of 20th March 1821, a similar penitentiary was provided for Eastern Pennsylvania, to be located within the county of Philadelphia. In pursuance of these Acts of Assembly, the two noble structures known as the Eastern and Western Penitentiaries were erected. By an Act of Assembly of 23d April 1829, the penal code was revised, crimes defined, and punishments in the two new penitentiaries enjoined. The government of the penitentiaries was committed to boards of inspectors, "consisting of five taxable citizens of

[Commonwealth *ex rel.* Johnson *v.* Halloway.]

Pennsylvania," to be appointed by the judges of the Supreme Court, and they were to act under "rules and regulations for the better ordering and governing of said penitentiaries," which the Act of 1829 set forth in full. Among other details the discharge of convicts was prescribed. Some immaterial provisions have been supplied by subsequent legislation, but the Act of 1829 established a system of punitive justice that has never been essentially modified, and which, by reason of the excellence of the conception and the fidelity of administration, has commanded the attention of the civilized world.

But on 1st of May 1861 the legislature passed an act "relative to prison discipline," which, while it does not profess to repeal prior acts respecting penitentiary punishments, nor to disturb the well-matured system which we possess, will, nevertheless, impose new and difficult duties on the inspectors and superintendents of all our prisons, and greatly impair the efficiency of our system, if it do not derange all of its outlines. The inspectors of the Eastern Penitentiary, with the entire concurrence of their colleagues of the Western, have set forth their objections to the Act of 1861, in a printed report of a committee of their body. They complain of the act as of doubtful constitutionality, and of such ambiguity that they are unable to carry it satisfactorily into execution. They say they first knew of its passage from the lips of a convict under their care, and that, according to their information, it passed one branch of the legislature at the latest moment of the session, without a word of observation or criticism from a single member.

It is much to be regretted that the legislature of 1861 permitted its powers to be employed in disturbing an admirable system of penitentiary punishment, without consulting any of the officers to whom the system had been intrusted for administration, and whose experience had qualified them for advising wisely in respect to the proposed measure. The act was, however, passed in all the forms of law, and two prisoners now claim their discharge from further confinement by virtue of its provisions.

The first section requires the wardens or superintendents to keep a record of the name of each prisoner, and of every infraction of the printed and published rules, and of the punishments inflicted therefor, which record is to be laid before the inspectors for examination and approval. The second section provides for a graduated "deduction from the term of sentence" of every prisoner who shall have no infraction of rules recorded against him for any month of the first year of his imprisonment—one day for the first month, two additional days for the second month, and three additional days for each succeeding month of the first year's imprisonment—and to a similar deduction of four days for each month of faultless conduct in the

second year, and to one additional day per month for each succeeding year.

The third section empowers the inspectors to discharge a criminal whenever he shall have served out his term of sentence, less the number of days to which the act entitles him.

The fourth section provides for a certificate from the inspectors of the good conduct of the prisoner on his discharge.

We do not think the act unconstitutional on account of its supposed interference with the governor's power of pardon.   It leaves the constitutional power of the executive to pardon and reprieve unimpaired.   A pardon operates directly on the crime, and only indirectly on the criminal.   He is discharged from further punishment under the operation of a pardon, because the offence is blotted out for which he was consigned to punishment. The pardon may take effect before the punishment begins or after it is ended.   It is addressed to the crime rather than to the penalty.   We cannot see how the governor's prerogative to pardon crime is impaired by the act under consideration.

But a majority of us think the act is unconstitutional as interfering with judgments of the judiciary.   The whole judicial power of the Commonwealth is vested in courts.   Not a fragment of it belongs to the legislature.   The trial, conviction, and sentencing of criminals are judicial duties, and the duration or period of the sentence is an essential part of a judicial judgment in a criminal record.   Can it be reversed or modified by a board of prison inspectors acting under legislative authority ?   If it can, what judicial decree is not exposed to legislative modifications ?   From what judicial sentence may not the legislature direct "deductions" to be made if this act be constitutional ?   What they may do indirectly they may do directly.   If they may authorize boards of inspectors to disregard judicial sentences, why may they not repeal them as fast as they are pronounced, and thus assume the highest judicial functions ?

It is to be observed, that these questions have no reference to the power of the legislature to prescribe a general rule of law that shall be inconsistent with a previous judicial decree.   Such a rule, when it operates on future cases and not retrospectively, is quite legitimate.   Their power to *legislate* in that manner is not to be doubted.   But under the act in question the good conduct of a particular individual, under judicial sentence, is to work out for him an abatement of a part of his sentence.   In respect to one of the relators who was convicted and sentenced before the law was passed, it is considered very clear that it is a legislative impairing of an existing legal judgment.   But is it not equally so in respect to him who was sentenced since the date of the act ?   The court could not have taken the act into account

[Commonwealth *ex rel.* Johnson *v.* Halloway.]

in measuring the sentence, because they could not know how many days of abatement the prisoner would earn. They could fix his sentence only by the exercise of that judicial discretion which the constitution has vested in the judiciary. Any interference with that sentence, except by a court of superior jurisdiction, or by the executive power of pardon, would seem to be a prostration of that distribution of governmental functions which the constitution makes among three co-ordinate departments. In this view the act would be highly unconstitutional.

But independently of the constitutional objection, which is not decisive with all of us, we think the inspectors have rendered such reasons for not executing the act, in the printed report above referred to, as justify them. The legislature evidently meant to leave them a measure of discretion. They are to approve or disapprove of the record made up in favour of each prisoner, and they are to discharge him or cancel his credits as to them seems just and right. The third section confers the power and authority to discharge, but does not expressly enjoin the duty. Doubtless the duty may be implied from the power, but it is a duty to be exercised under a sound discretion. In the exercise of that discretion, thus left with them, they have declined to discharge the relators, and, indeed, to execute the law. They say it would derange the system of administration long pursued—that the eldest and most experienced criminals would reap the largest benefits from the act, for it is they who, having been most in prison, are most observant of prison rules, and that public justice would not be promoted by an execution of the law.

We will not overrule their reasons nor control their discretion. The letters from other states in reference to the operation of similar statutes, under different systems of punitive discipline, do not weigh very much with us. Our own experience under our peculiar system is opposed to all such attempts at alleviating prison discipline, and we think it may be safely trusted. The danger of our day is not in the direction of a too rigorous punishment of public criminals, but rather to the letting of the guilty · go unwhipped of justice.

The prisoners are remanded into custody.

LOWRIE, C. J., was absent on account of a death in his family.