**Ertle DIAL, Petitioner,**

**v.**

**Mr. Donald T. VAUGHN, Superinten-
dent of the State Correctional Institu-
tion at Graterford; Mike Fisher, At-
torney General of the Commonwealth
of Pennsylvania and Pennsylvania
State Police, Respondents.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 16, 1998.
Decided May 20, 1999.

No appearance entered for petitioner.

Joel M. Ressler, Senior Deputy AG, Harrisburg, for respondent.

Before COLINS, President Judge, and DOYLE, J., McGINLEY, J., SMITH, J., PELLEGRINI, J., FRIEDMAN, J. and LEADBETTER, J.

LEADBETTER, Judge.

By a petition under our original jurisdiction,[1] Ertle Dial, an inmate at Graterford SCI, challenges the constitutionality of the requirement that he submit a

1. Dial's amended petition for a writ of habeas corpus has been treated as a petition for re-view.

blood sample for DNA testing pursuant to the DNA Detection of Sexual and Violent Offenders Act (Act).[2] This is an issue of first impression. Dial contends that the Act, by retroactively adding a condition of parole, violates the doctrine of separation of power, invalidates his guilty plea,[3] and violates the ex post facto prohibitions of the constitutions of Pennsylvania and the United States and the fourth amendment of the United States Constitution. Dial avers that during his confinement at Graterford, following his entry of a guilty plea to an unspecified sex offense, a sample of his blood was taken for DNA testing pursuant to Section 306(b) of the Act, 35 P.S. § 7651.306(b). He seeks the removal of his DNA information from the data bank and an injunction against further DNA testing as a condition of his release on parole.

■ Respondents, Donald Vaughn, Superintendent at Graterford, the Commonwealth Attorney General and the State Police, (collectively referred to as Commonwealth) filed preliminary objections in the nature of demurrers to the claims that the Act violates the separation of powers doctrine and constitutes an ex post facto law. In deciding preliminary objections, we accept as true the well-pleaded facts that are material and relevant to petitioner's claim. *Dial v. Board of Probation and Parole*, 706 A.2d 901, 902 (Pa.Cmwlth. 1998). We need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations or expressions of opinion. *Id.*

In general, Pennsylvania's DNA Act establishes an administrative process for the implementation of a DNA identification system as a tool in criminal investigations and for deterrence of recidivist crime. 35

P.S. §§ 7651.102 and 7651.302. The identification system contains DNA data from persons convicted of felony sex offenses, murder, harassment and stalking, and indecent assault. 35 P.S. § 7651.306. Section 306 of the Act establishes requirements for the submission of blood samples from persons convicted of the specified crimes. Section 306(b) provides as follows:

(b) **Conviction before effective date.** – A person who has been convicted or adjudicated delinquent for a felony sex offense or other specified offense before the effective date of this section and who is still serving a term of confinement in connection therewith on the effective date of this section shall not be released in any manner prior to the expiration of his maximum term of confinement unless and until a DNA sample has been withdrawn.

■ The Commonwealth first demurs to Dial's claim that the Act deprives him of eligibility for parole and in consequence affects the duration of his incarceration in violation of the doctrine of separation of powers. There is no question that final judgments of the judiciary are inviolable and a final judgment of sentence may not be disturbed by a subsequent legislative change. *Commonwealth v. Sutley*, 474 Pa. 256, 263, 378 A.2d 780, 784–785 (1977). This rule does not, however, preclude legislative enactment that changes the manner of executing the sentence. In *Sutley*, the court explained:

[T]he legal sentence is the maximum sentence. The reason being that while the minimum sentence determines parole eligibility, the maximum sets forth the period of time that the state intends to exercise its control over the offender for his errant behavior. The judicial

---

**2.** Act of May 28, 1995, P.L. 1009, §§ 101–1102, 35 P.S. §§ 7651.101–7651.1102.

**3.** The instant petition for injunctive and declaratory relief challenging the constitutionality of the DNA Act is not the proper forum in which to collaterally attack the validity of the plea. The proper procedure for attacking a

guilty plea following sentencing is to file with the trial court, which accepted the plea, a petition to withdraw the plea. *Commonwealth v. Porta*, 297 Pa.Super. 298, 443 A.2d 845, 847 (1982) or a petition for post conviction relief pursuant to 42 Pa.C.S. §§ 9541–9546.

discretion is the determination of the period of control over the person of the offender in view of the nature of the crime, the background of the defendant and the other pertinent considerations for such a decision. It is this exercise of discretion that the rule of the "inviolability of final judgment" seeks to protect. The institution in which the sentence is to be served, the objects sought to be accomplished during this period of control and all the other penological considerations are not primarily judicial functions.

*Id.* at 268, 378 A.2d at 786 (citations omitted).

■ The requirement that Dial submit to pre-release withdrawal of a blood sample for DNA testing does not alter his maximum sentence. Nor does the Act alter Dial's parole eligibility date. Once eligibility has been achieved by incarceration for the prescribed minimum time, actual release on parole may depend on full compliance with a variety of prison rules and administrative requirements. The Act defines an administrative requirement that must be satisfied prior to release. This requirement is similar to the requirement for acquisition and storage of other convict identification records in the form of photos, fingerprints and physical description compiled at the time of arrest. See 18 Pa.C.S. § 9112 and the Act of April 27, 1927, P.L. 414, *as amended,* 61 P.S. §§ 2171–2177. The power to parole is an administrative function. *Sutley,* 474 Pa. at 266, 378 A.2d at 785 *quoting Commonwealth ex rel. Banks v. Cain,* 345 Pa. 581, 588–89, 28 A.2d 897, 901 (1942). In the instant case, the Act establishes an administrative process for identification and Dial challenges the particular subsection that promotes prisoner cooperation with the identification process. No provision of the Act alters the judgment of sentence rendered by the sentencing court. For this reason, Dial is unable to maintain a claim that the Act violates the doctrine of separation of powers. Accordingly, the Commonwealth's preliminary objection in the nature of a demurrer to this claim is sustained.

■ Next, the Commonwealth demurs to Dial's claim that subsection 306(b) of the Act, 35 P.S. § 7651.306(b), effects an ex post facto enhancement of his sentence in violation of Article 1, Section 10 of the United States Constitution and Article 1, Section 17 of the Pennsylvania Constitution. A law transgresses the ex post facto prohibition only where, first, the law is retrospective and second, it alters the definition of criminal conduct or increases the penalty by which crime is punishable. *California Dep't of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). *See also Del Valle v. Workmen's Compensation Appeal Bd. (Pennsylvania Dep't of Educ.),* 687 A.2d 1211, 1212 (Pa.Cmwlth.1997).[4] There is no ex post facto violation if the legislation is not penal in nature, *Van Doren v. Mazurkiewicz,* 695 A.2d 967 (Pa.Cmwlth.1997); *Commonwealth v. Kline,* 695 A.2d 872 (Pa.Super.1997), *alloc. denied,* 552 Pa. 694, 716 A.2d 1248 (1998), but is merely procedural, *U.S. v. Askari,* 608 F.Supp. 1045, 1048 (E.D.Pa.1985).

The Commonwealth argues that the blood testing requirement is not penal and

---

4. In *Del Valle,* our court, in articulating the elements of an ex post facto law, cited *Crowell v. U.S. Parole Commission,* 724 F.2d 1406 (3d Cir.1984) for the premise that a law is ex post facto if it operates retroactively and results in new disadvantage to the offender. After the Supreme Court's decision in *Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), the inquiry became more focused and required a determination of whether the definition of the crime changed or the penalty was enhanced. *See California Dep't of Corrections v. Morales,* 514 U.S. 499, 506 n. 3, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). We believe the focus on specifics rather than vague disadvantage is the better approach and, therefore, clarify that the "disadvantage" referred to in *Del Valle* is the alteration in the definition of crime or increase in punishment. *See Lynce v. Mathis,* 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997).

therefore cannot offend the ex post facto clause. We agree. The testing program is non-penal because there is no evidence, in its purpose or its design, of any intent to punish or requirements so harsh as to objectively constitute punishment. *E.B. v. Verniero,* 119 F.3d 1077, 1088–89 (3d Cir. 1996), *cert. denied,* — U.S. —, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998). The collection of blood for identification and establishment of a DNA data bank is, like fingerprinting and photographing, a non-penal, administrative requirement. *See Gilbert v. Peters,* 55 F.3d 237, 239 (7 th Cir.1995). See also *Rise v. Oregon,* 59 F.3d 1556, 1562 (9 th Cir.1995), cert. denied, 517 U.S. 1160, 116 S.Ct. 1554, 134 L.Ed.2d 656 (1996); *Kruger v. Erickson,* 875 F.Supp. 583, 589 (D.Minn.1995), *affirmed,* 77 F.3d 1071 (8 th Cir.1996). Moreover, the blood testing is reasonable because it constitutes a limited search involving minor intrusion, *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 625, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), on persons with diminished expectations of privacy, *Bell v. Wolfish,* 441 U.S. 520, 559–60, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), for the purpose of improved law enforcement, *Jones v. Murray,* 962 F.2d at 307.

Nor do we believe that denial of parole for refusal to comply with the Act's sample collection requirements is ex post facto. We are guided in this decision by the opinion of the United States Court of Appeals for the Fourth Circuit in *Jones v. Murray,* 962 F.2d 302 (4 th Cir.), *cert. denied,* 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992).[5] In 1990, the Commonwealth of Virginia enacted a DNA detection act similar to the Pennsylvania statute.[6] Pursuant to the statute, the Virginia Department of Corrections established procedures by which blood samples would be drawn from inmates falling within the scope of the statute. The department required every felon in custody on or after the relevant date to provide a blood sample prior to the individuals' discretionary parole eligibility date or thirty days prior to the mandatory parole date if the discretionary date had passed. Six inmates challenged the statute and regulations on the grounds that the program violated the fourth amendment, the ex post facto clause and the fourteenth amendment due process clause.

With respect to the ex post facto claim, the court in *Jones* held that the prohibition against the release of non-compliant inmates who had reached their mandatory parole date [7] was an ex post facto enhance-

5. DNA identification statutes have also withstood constitutional scrutiny in the Ninth Circuit, *Rise v. Oregon,* 59 F.3d 1556 (9 th Cir. 1995), *cert. denied,* 517 U.S. 1160, 116 S.Ct. 1554, 134 L.Ed.2d 656 (1996) (holding Oregon statute not in violation of Fourth Amendment or Ex Post Facto Clause), and in the Tenth Circuit, *Boling v. Romer,* 101 F.3d 1336 (10 th Cir.1996) (holding Colorado statute not in violation of Fourth Amendment, Fifth Amendment or due process interests); *Schlicher v. Peters,* 103 F.3d 940 (10 th Cir. 1996) (holding Kansas statute not in violation of Fourth Amendment).

6. See Va.Code. §§ 19.2–310.2 through 19.2–310.7. Section 19.2–310.2 provided in pertinent part, as follows:

After July 1, 1990, the blood sample shall be taken prior to release from custody.

Notwithstanding the provisions of 53.1–159, [the mandatory release on parole requirement], any person convicted of a felo-

ny who is in custody after July 1, 1990, shall provide a blood sample prior to his release.

7. At the time Virginia enacted its DNA blood testing program, Va.Code §§ 19.2–310.2–19.2–310.7, there existed a mandatory parole system pursuant to Va.Code § 53.1–159 which provided as follows:

Every person who is sentenced and committed under the laws of the Commonwealth to the Department of Corrections ... shall be released on parole by the Virginia Parole Board six months prior to his date of final discharge.

Pennsylvania has not enacted a mandatory parole statute and parole in Pennsylvania is discretionary. *Weaver v. Pennsylvania Bd. of Probation and Parole,* 688 A.2d 766 (Pa. Cmwlth.1997); *Reider v. Pennsylvania Bd. of Probation and Parole,* 100 Pa.Cmwlth. 333, 514 A.2d 967 (1986).

ment of the terms of original sentence. However, section 306 of the Pennsylvania Act does not limit release beyond the mandatory release date established under the terms of the original sentence. Thus, the Pennsylvania Act does not increase the measure of punishment attached to the crime at the time of its commission and thereby avoids the constitutional defect in the Virginia statute.

Where the mandatory parole date had not yet been reached, the *Jones* court concluded that retention of non-compliant inmates was not an ex post facto law since that retention did not exceed the terms of the prisoners' original sentence. The court reasoned that prisoners who refused to provide a blood sample for DNA testing could be administratively punished and such punishment would not be ex post facto. The court stated:

> The Ex Post Facto Clause does not prevent prison administrators from adopting and enforcing reasonable regulations that are consistent with good prison administration, safety and efficiency....
>
> [C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and denials of privileges – matters which every prisoner can anticipate are contemplated by his original sentence to prison – are necessarily functions of prison management that must be left to the broad discretion of prison administrators.

It is precisely because reasonable prison regulations, and subsequent punishment for infractions thereof, are contemplated as part of the sentence of every prisoner, that they do not constitute additional punishment and are not classified as ex post facto. Moreover, since a prisoner's original sentence does not embrace a right to one set of regulations over another, reasonable amendments, too, fall within the anticipated sentence of every inmate. We therefore conclude that neither [the] blood-testing requirement, itself, nor the infliction of punishment within the terms of the prisoner's original sentence for a violation of the requirement, is ex post facto. (citations omitted).

*Jones v. Murray,* 962 F.2d at 309. *Accord Doe v. Gainer,* 162 Ill.2d 15, 204 Ill.Dec. 652, 642 N.E.2d 114 (1994), *cert. denied,* 513 U.S. 1168, 115 S.Ct. 1139, 130 L.Ed.2d 1099 (1995). Additionally, the court noted that "whatever punishment or disadvantage is imposed results, not by reason of conduct that took place before enactment of the statute, so as to become retrospective, but from conduct that occurred after enactment in refusing to comply with reasonable regulation." *Id.* at 309, n. 3. *Accord Gilbert v. Peters,* 55 F.3d at 239. Like that portion of the Virginia statute found to pass constitutional muster in *Jones v. Murray,* the Pennsylvania DNA Act imposes an administrative punishment for non-compliance with a reasonable administrative regulation enacted prior to the act of non-compliance.

Finally, in his petition, Dial asserts that the testing program under the DNA Act violates the Fourth Amendment prohibition against unreasonable search and seizure. The Commonwealth has not asserted a preliminary objection to this claim. However, our determination that the Act is a valid administrative regulation is dependent upon our conclusion that the Act passes fourth amendment scrutiny.

Without question, obtaining a blood sample for testing is a search and seizure subject to the reasonableness requirement established under the fourth amendment. *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In some limited situations, special needs beyond the normal law enforcement needs may make the warrant and probable cause requirement impracticable and permit a determination of fourth amendment reasonableness based upon a balancing of governmental and privacy interests. *Griffin v. Wisconsin,* 483 U.S.

868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). In the context of Dial's situation as a convicted inmate, the reasonableness of the search may be established even absent a showing of probable cause or reasonable suspicion. *Bell v. Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861. The court, in *Bell v. Wolfish,* stated that in deciding the reasonableness of an inmate search, "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559, 99 S.Ct. 1861.

In the instant case, the blood-testing program subjects a target population of convicted inmates with reduced privacy expectations, *Bell,* 441 U.S. at 559–60, 99 S.Ct. 1861, to a relatively minimal intrusion, *Skinner,* 489 U.S. at 625, 109 S.Ct. 1402; *Schmerber,* 384 U.S. at 771, 86 S.Ct. 1826, in furtherance of the Commonwealth's need to maintain an identification system to deter recidivism. The slight intrusion occasioned by the withdrawal of blood is outweighed by the special public interest in maintaining an identification data bank. *See Rise v. Oregon,* 59 F.3d 1556, 1560 (holding Oregon statute creating DNA database not in violation of Fourth Amendment and citing *Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) for application of "special needs" balancing test) and *Jones v. Murray,* 962 F.2d at 306 (applying "special needs" balancing test to determine that sample collection program under Virginia DNA identification statute was reasonable). The program established by the Act is, on its face, evenhanded in its application and reasonable in the manner in which it is conducted. Petitioner has not made any averments tending to demonstrate otherwise.

Accordingly, the preliminary objections to the amended petition for review are sustained. In light of our conclusion that,

as a matter of law, the petitioner is unable to prevail on any theory espoused in his amended petition, the amended petition is dismissed.

## ORDER

AND NOW, this 20th day of May, 1999, the preliminary objections to the amended petition for review are hereby sustained and the petition is hereby dismissed for failure to state a claim upon which relief may be granted.

FRIEDMAN, Judge, dissenting.

I respectfully dissent. Unlike the majority, I believe that the provisions of the DNA Detection of Sexual and Violent Offenders Act (DNA Act)[1] violate the separation of powers doctrine, the ex post facto clauses of the United States and Pennsylvania Constitutions and the Fourth Amendment to the United States Constitution.

### I. Separation of Powers

The majority holds that the DNA Act does not violate the separation of powers doctrine because the DNA Act does not alter Dial's sentence. (Majority op. at 4.) I disagree.

Article V, section 1 of the Pennsylvania Constitution provides that the "judicial power" of the Commonwealth shall be vested in the unified judicial system. This means that "[t]he *whole* judicial power of the Commonwealth is vested in courts. Not a fragment of it belongs to the legislature." *Young v. Commonwealth Board of Probation and Parole,* 487 Pa. 428, 432, 409 A.2d 843, 846 (1979) (quoting *Commonwealth ex rel. Johnson v. Halloway,* 42 Pa. 446, 448 (1862)) (emphasis added). Moreover, "[t]he sentencing power is a well recognized facet of the judicial power."[2] *Id.* at 432, 409 A.2d at 845.

---

1. Act of May 28, 1995, P.L. 1009, 35 P.S. §§ 7651.101–7651.1102.

2. It is a legislative function to enact the laws that govern sentencing, but it is a judicial function to actually impose an appropriate

Under federal law, parole eligibility is part of a prisoner's sentence. *Warden v. Marrero*, 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974); *see also Jones v. Murray*, 962 F.2d 302 (4th Cir.), *cert. denied*, 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992) (stating that parole eligibility is a facet of the sentence imposed). By establishing a maximum sentence and a minimum sentence at the time of sentencing, the district judge "determines when the offender will become eligible for consideration for parole."[3] *Warden*, 417 U.S. at 659, 94 S.Ct. 2532.

Likewise, in Pennsylvania, the sentencing judge establishes parole eligibility at the time of sentencing when the judge establishes a maximum and a minimum sentence pursuant to the Sentencing Code.[4] However, the legislature, through its enactment of section 306(b) of the DNA Act,[5] has completely negated the minimum sentence, and parole eligibility, for every prisoner who has been convicted of an offense specified in the DNA Act and who refuses to submit to DNA testing.

Section 306(b) of the DNA Act states that a person serving a term of confinement for the specified offenses "shall not be released in any manner prior to the expiration of his maximum term of confinement unless and until a DNA sample has been withdrawn." This means that such prisoners who refuse to submit to DNA testing may not be released on parole. *See* 35 P.S. § 7651.306(e). Thus, in effect, the legislature has imposed a *different sentence*, a sentence without parole, on prisoners who refuse to submit to DNA testing.[6] Because the legislature has re-sentenced these prisoners to serve a term of confinement without parole, the legislature has usurped the judicial sentencing function and violated the separation of powers doctrine.[7]

In reaching a contrary result, the majority relies on *Commonwealth v. Sutley*, 474 Pa. 256, 378 A.2d 780 (1977), for the proposition that a prisoner's legal sentence is only the maximum sentence. The majority concludes, based on *Sutley*, that the

sentence in a given case. *See Commonwealth v. Sutley*, 474 Pa. 256, 378 A.2d 780 (1977).

3. Under federal law, generally, an offender becomes eligible for parole after serving one-third of his sentence. *See Warden; see also* 18 U.S.C. § 4208(a).

4. By operation of law, the maximum sentence establishes the minimum sentence, when an offender is eligible for parole. *See* section 9756(b) of the Sentencing Code, 42 Pa.C.S. § 9756(b) (stating that the minimum sentence shall not exceed one-half of the maximum sentence); *see also* section 21 of the Parole Act, Act of August 6, 1941, P.L. 861, *as amended*, 61 P.S. § 331.21 (stating that the Parole Board may only grant parole after the expiration of the minimum sentence).

5. 35 P.S. § 7651.306(b).

6. I note that section 306(b) of the DNA Act is in conflict with some of the very provisions of the Sentencing Code that govern the offenses specified in the DNA Act. For example, sections 9717 and 9718 of the Sentencing Code, which establish mandatory sentences for sexual offenses against elderly and infant persons, state that: "Parole shall not be granted

until the minimum term of imprisonment has been served." 42 Pa.C.S. §§ 9717(b) and 9718(b). However, pursuant to section 306(b) of the DNA Act, parole shall not be granted for such offenses until the minimum term of imprisonment has been served *and until the prisoner has submitted to DNA testing*.

7. I point out that, in Pennsylvania, a sentence must be imposed for the *minimum* amount of time that is consistent with the gravity of the offense, the rehabilitative needs of the defendant and the protection of the public. Section 9721(b) of the Sentencing Code, 42 Pa. C.S. § 9721(b); *Commonwealth v. Corson*, 298 Pa.Super. 51, 444 A.2d 170 (1982). In each case, the sentencing judge considers these factors and determines an appropriate sentence for the offender. If the sentencing judge determines that an offender should become eligible for parole after serving a minimum sentence, the legislature cannot interfere with that judicial determination. Indeed, the U.S. Supreme Court has stated: "[I]t could not be seriously argued that sentencing decisions are made without regard to the period of time a defendant must spend in prison before becoming eligible for parole." *Warden*, 417 U.S. at 658, 94 S.Ct. 2532.

DNA Act does not violate the separation of powers doctrine because it does not alter a prisoner's maximum sentence. (Majority op. at 4.) However, the Pennsylvania Supreme Court stated in *Sutley* that, although a prisoner's legal sentence is the maximum sentence, a law altering a prisoner's minimum sentence "might constitute an unwarranted usurpation of judicial authority."[8] *Id.* at 269 n. 8, 378 A.2d at 786 n. 8 (citing *Commonwealth ex rel. Banks v. Cain,* 345 Pa. 581, 28 A.2d 897 (1942); *see also Commonwealth v. Henderson,* 482 Pa. 359, 367, 393 A.2d 1146, 1150 (1978)). Thus, I would not rely on *Sutley* to conclude that the DNA Act, which goes far beyond *altering* a prisoner's minimum sentence, does not violate the separation of powers doctrine.

## II. Ex Post Facto Violation

The majority also holds that the DNA Act does not violate the ex post facto clauses of the United States and Pennsylvania Constitutions.[9] (Majority op. at 4–7.) Again, I disagree.

The ex post facto clause is "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *California Dep't of Corrections v. Morales,* 514 U.S. 499, 504, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). Thus, two critical elements must be present to establish that a law violates the ex post facto prohibition: (1) the law must be retrospective, that is, it must apply to events occurring before its enactment; and (2) the law must disadvantage the persons affected by the law. *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981). Here, the question is whether the DNA Act retroactively increases the punishment for the crimes specified in the DNA Act.

The majority examines two aspects of the DNA Act for possible ex post facto violations: (1) the DNA testing itself; and (2) the denial of parole for refusing to submit to DNA testing. In the first instance, the majority concludes that DNA testing itself involves no punishment at all. (Majority op. at 4–5.) I cannot agree.

Section 307 of the DNA Act, 35 P.S. § 7651.307, governs the drawing of DNA samples[10] from prisoners. Section 307(c) of the DNA Act, 35 P.S. § 7651.307(c) (emphasis added), provides as follows: "Duly authorized law enforcement and corrections personnel may employ *reasonable force* in cases where an individual refuses to submit to DNA testing authorized under this act, and no such employee shall be criminally or civilly liable for the use of reasonable force."[11]

Thus, while section 306(b) of the DNA Act suggests that a prisoner may refuse DNA testing and serve his or her maximum term of confinement, section 307(c) of the DNA Act authorizes prison officials to use "reasonable force" when a prisoner refuses DNA testing. The majority does not address section 307(c) or the use of "reasonable force" in the taking of a blood or tissue sample for DNA testing. Does

8. The court in *Sutley* declined to address whether a legislative interference with the minimum sentence of a prisoner violates the separation of powers doctrine. *See Sutley,* 474 Pa. at 269 n. 8, 378 A.2d at 786 n. 8.

9. Article I, section 10 of the United States Constitution and Article I, section 17 of the Pennsylvania Constitution prohibit the passage of any ex post facto law.

10. A "DNA sample" is a "blood or tissue sample." Section 103 of the DNA Act, 35 P.S. § 7651.103. The majority seems to assume that a DNA sample is only a blood sample and does not address the implications of taking a "tissue sample" from a prisoner.

11. As a general rule, authorities may use "that reasonable force which is necessary to effectuate their legitimate purpose." *Commonwealth v. French,* 531 Pa. 42, 53, 611 A.2d 175, 180 (1992) (J. McDermott, concurring); *see* sections 504 and 509(5) of the Crimes Code, 18 Pa.C.S. §§ 504 and 509(5). The word "force" means: "Power, violence, compulsion, or constraint exerted upon or against a person...." *Black's Law Dictionary* 644 (6th ed.1990).

section 307(c) mean that officials can beat a prisoner until he or she submits to DNA testing? Does it mean that officials can physically restrain or strap down a prisoner in order to collect a DNA sample? Does it mean that officials can threaten, intimidate or terrorize a prisoner in order to obtain a DNA sample? Does section 307(c) mean that officials can suspend a prisoner's privileges or place a prisoner in restrictive housing until the prisoner submits to DNA testing? [12] *See* 37 Pa.Code § 93.10 (authorizing suspension of privileges and placement in restrictive housing as means of discipline for misconduct). If the DNA Act authorizes any of these means of coercion, then the DNA testing process involves punishment.

With respect to the denial of parole for refusing to submit to DNA testing, the majority acknowledges that this is punishment. (Majority op. at 6.) However, the majority concludes that the punishment is not retrospective because it is imposed "for non-compliance with a reasonable administrative regulation enacted prior to the act of non-compliance." [13] (Majority op. at 6.)

A proper analysis of the retroactivity issue examines whether the relevant provision of the DNA Act "applies to prisoners convicted for acts committed before the provision's effective date." *Weaver,* 450

U.S. at 31, 101 S.Ct. 960. Here, the relevant provision is section 306(b) of the DNA Act, 35 P.S. § 7651.306(b), which is entitled **"Conviction before effective date."** This title alone indicates that section 306(b) of the DNA Act is retroactive in nature; indeed, it shows that the provision applies to prisoners with convictions *before* the effective date.

The retrospective nature of section 306(b) of the DNA Act is equally apparent from the fact that the provision does *not* apply to *all* prisoners. The provision applies *only* to a category of prisoners who have been *previously* convicted for one of the specified offenses. Thus, the punishment for refusing to submit to DNA testing, the denial of parole, is based on *past* conduct for which certain prisoners were convicted.

Because the DNA Act retroactively increases the punishment of certain prisoners, I conclude that the DNA Act violates the ex post facto clauses of the United States Constitution and the Pennsylvania Constitution.[14]

### III. Fourth Amendment

Finally, the majority concludes that the DNA testing program does not violate the Fourth Amendment prohibition against unreasonable search and seizure. (Majority op. at 7.) Prior to its discussion of the

---

12. The majority indicates that, in Virginia, prison officials may administratively punish prisoners who refuse to provide a blood sample for DNA testing. (Majority op. at 8.) It is not clear whether the majority believes that prison officials in Pennsylvania may do likewise.

13. I note that the DNA Act is *not* an administrative regulation. Certainly, the DNA Act allows prison officials to punish administratively certain prisoners who refuse to submit to DNA testing. However, there is no connection whatsoever between the creation of a DNA data bank and the safe and efficient operation of Pennsylvania's prisons. *See Jones,* (J. Murnaghan, concurring and dissenting) (creation of DNA data bank unrelated to any institutional penal purpose). Moreover, if the DNA Act served a legitimate administra-

tive purpose, it would apply to *all* prisoners and not just to sex offenders and prisoners who have been convicted of the other specified offenses.

I further note that regulations were adopted pursuant to the DNA Act at 37 Pa.Code §§ 59.1–59.21 on October 18, 1996. However, these regulations are not the subject of our inquiry here. Indeed, the majority does not identify or discuss these regulations.

14. *Cf. Lynce v. Mathis,* 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) (stating that retroactive alteration of parole provisions implicates the ex post facto clause); *see also Warden,* 417 U.S. at 663, 94 S.Ct. 2532, (stating that an act repealing "parole eligibility previously available to imprisoned offenders would clearly present [a] serious question under the ex post facto clause. . . .").

matter, the majority acknowledges that the Commonwealth has not raised a preliminary objection to Dial's Fourth Amendment claim. (Majority op. at 6.) For this reason, I would not address the Fourth Amendment issue. However, I do so here because I cannot agree with the majority's conclusion.

"The Fourth Amendment prohibits only unreasonable searches." *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The test of reasonableness in each case "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Id.* at 559, 99 S.Ct. 1861. To determine the reasonableness of a search, courts must consider the following: (1) the scope of the particular intrusion; (2) the manner in which it is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted. *Id.*

### A.  Scope of Intrusion

The majority cites *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), for the proposition that the withdrawal of blood from a person's body for DNA testing involves a relatively minimal intrusion. However, the DNA Act authorizes not only a blood test, but also the taking of a *tissue* sample. 35 P.S. § 7651.103. In *Schmerber,* 384 U.S. at 772, 86 S.Ct. 1826, the court held that "the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions . . . [but the Constitution does forbid] more substantial intrusions . . . ." Because there is nothing before us to indicate whether the taking of a tissue sample involves a more substantial intrusion than the taking of a blood sample, I cannot

conclude that the DNA Act involves only a minimal intrusion.

The majority also suggests that DNA testing is a minimal intrusion "like fingerprinting." (Majority op. at 5.) However, the National Research Council of the National Academy of Sciences, in a report entitled "DNA Technology in Forensic Science," pointed out that DNA testing is less reliable than fingerprinting, more costly and more difficult to obtain, and it represents a *greater intrusion* on an individual's privacy than fingerprinting. Sheryl H. Love, *Note: Allowing New Technology to Erode Constitutional Protections: A Fourth Amendment Challenge to Non–Consensual DNA Testing of Prisoners,* 38 Vill. L.Rev. 1617, 1645–46 (1993) (hereinafter *Allowing New Technology* ). Indeed, once scientists are able to map human DNA, DNA samples will reveal everything about a person, including race, appearance and predisposition to disease.[15]  *Id.*  The majority does not consider this potential expansive intrusion into a prisoner's privacy from DNA testing, but I cannot ignore it.

### B.  Manner of Testing

Section 307(a) of the DNA Act, 35 P.S. § 7651.307(a), requires that qualified individuals must draw the DNA samples "in a medically approved manner." However, authorities "may employ reasonable force" if a prisoner refuses to submit to DNA testing. 35 P.S. § 307(c). As indicated above, I do not believe that *any* force is reasonable when a prisoner refuses to submit to DNA testing. Thus, to the extent that the DNA Act authorizes force in conducting the DNA test, I conclude that the manner of conducting the DNA test is unreasonable.

### C.  Justification for Testing

As applicable here, the justification for the DNA testing of samples from individu-

---

**15.**  I note that a person's DNA samples will be retained in the DNA data bank for at least 50    years. *See* 37 Pa.Code § 59.11(3)(vii).

als convicted of felony sex offenses and other specified offenses is to establish a DNA data bank to assist law enforcement agencies in criminal investigations and to deter recidivist acts.[16] 35 P.S. § 7651.102. I find this justification unreasonable for several reasons.

The first reason is that the DNA Act makes an irrational distinction between different classes of prisoners. There is no factual basis for taking DNA samples from a particular group of prisoners instead of from *all* prisoners. If the DNA data bank can help identify recidivists who have been convicted previously of felony sex offenses, murder, harassment, stalking and indecent assault, then the DNA data bank can help identify recidivists who have been convicted previously of kidnapping, arson, burglary, robbery, theft and other crimes. Indeed, burglars and thieves have a much higher recidivism rate than persons convicted of rape.[17] It makes no sense to require DNA samples from prisoners who are less likely to commit the same crime after release from prison, but not to require DNA samples from prisoners who are more likely to commit the same crime after release from prison.

The second reason is that the DNA Act does nothing to deter the recidivism of those prisoners who refuse DNA testing and elect to serve their maximum terms of confinement. Prisoners who refuse to submit to DNA testing are likely to be the hard-core offenders, the ones most likely to be recidivists. These prisoners may not be released on parole, or on furlough, and may not participate in work release or any other prerelease program. *See* 35 P.S. § 7651.306(e). Without any expectation of release before the conclusion of their maximum terms, these prisoners will have no reason to seek treatment or to participate in rehabilitation programs. These prisoners will most likely complete their maximum terms with absolutely no rehabilitation; they will commit the same crimes for which they were incarcerated; and law enforcement agencies will *not* have a DNA profile for them. Thus, the DNA Act establishes a DNA testing program that ultimately defeats the very purpose of the statute.

The third reason is that the DNA profiles retained in the DNA data bank may not even be admissible as evidence in Pennsylvania courts. In *Commonwealth v. Blasioli*, 552 Pa. 149, 713 A.2d 1117 (1998) (relying on *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395 (1994)), our supreme court stated that the restriction fragment length polymorphism (RFLP) method of DNA profiling is admissible as evidence in Pennsylvania courts under the standard set forth in *Frye v. United States* 293 F. 1013 (D.C.Cir.1923). However, the court noted that scientists have developed a newer method of DNA analysis, the polymerase chain reaction (PCR) method, which has not yet gained acceptance in the scientific community and, thus, would not be admissible evidence under *Frye*.[18] *Id.* The DNA Act does not require the use of a particular method of DNA analysis in creating the DNA data bank. Moreover, there is no evidence before us here to show that the

---

16. The DNA Act indicates that other states have enacted similar laws. *See* 35 P.S. § 7651.102. However, the fact that other states have similar laws does not, by itself, justify the enactment of the DNA Act in Pennsylvania.

17. In a leading study, social scientists found: (1) the recidivism rate for burglary was 31.9%; (2) the recidivism rate for larceny was 33.5%; (3) the recidivism rate for drug offenses was 24.8%; and (4) the recidivism rate for rape was 7.7%. *See* Roger C. Park, *Charac-*

*ter at the Crossroads*, 49 Hastings L.J. 717 (March 1998). The low recidivism rate for rape is no doubt because more than eighty per cent of all rape cases involve acquaintance rape and because it is easier to apprehend a known assailant than a stranger. *See Critical Perspectives on Megan's Law: Protection vs. Privacy*, 13 N.Y.L. Sch. J. Hum. Rts. 1 (1996).

18. The court did not discuss all of the different methods of DNA analysis. *See Allowing New Technology.*

DNA profiles stored in the DNA data bank would be admissible evidence under *Frye.* If the DNA profiles are *not* admissible evidence, then there is *no* justification for the DNA data bank.

The fourth reason is that, even if the DNA profiles are admissible under *Frye,* DNA profiles do not identify individuals with 100% accuracy. DNA profiles only provide evidence of a statistical probability that a person has some connection with a crime. *See Allowing New Technology.* Thus, in each case involving DNA profiles, there must be statistical evidence to explain the significance of the DNA profiles. However, like some DNA profiles, some statistical evidence is not admissible under *Frye.* In *Blasioli,* our supreme court held for the first time that statistical evidence based upon "the product rule" is admissible under *Frye.* The DNA Act does not require that prosecutors use statistical evidence based on "the product rule" to explain DNA profile evidence. If the statistical evidence used by prosecutors is not admissible under *Frye,* then the DNA profile has no evidentiary value. If the DNA profile has no evidentiary value, then there is no reason for the DNA data bank.

### D. Place for Testing

As for the place of the search, section 307(a) of the DNA Act, 35 P.S. § 7651.307(a), states that DNA samples will be drawn from prisoners at the place of incarceration. In this case, the place of incarceration is Graterford State Correctional Institution (SCI). However, there is nothing before us to show that the facilities at Graterford SCI permit the taking of DNA samples in a medically approved manner. Without such evidence, I cannot conclude that DNA testing at Graterford SCI constitutes a reasonable search.

Based on the foregoing, I would conclude that the DNA testing program established by the DNA Act violates the Fourth Amendment prohibition against unreasonable searches. Accordingly, I would overrule the preliminary objections.